Sarah (a slave) vs. The State.

## SARAH (A SLAVE) *vs.* THE STATE.

1. It is not error in the Court to allow a prisoner in a capital case, to be tried by a jury taken from the grand jury list, by the consent of both counsel for the State and the accused.

2. As the prisoner may waive even a trial itself, and be capitally punished upon his own confession of guilt, he may waive every minor right or privilege. The greater includes the less, or the whole the parts.

3. The confession of a slave freely and voluntarily made at the time is not rendered objectionable because punishment had been inflicted at some previous period, to compel her to confess.

4. On a motion for a new trial on the ground of newly discovered testimony, the fact expected to be proved, should, if possible, be verified, and it is necessary for the defendant to swear that the evidence was unknown at the time of trial.

5. Notwithstanding the presiding Judge may betray some emotion on the trial of a criminal cause, still if no rule of law is violated, a new trial will not on that account be granted.

6. Where a slight mistake occurs in taking down the testimony which is read to the jury, a new trial will not be granted if the evidence, was full and complete otherwise, as to the guilt of the accused.

7. The Court itself may take down the testimony in a criminal case instead of having it done by an amanuensis.

8. The omission of the Court to ask the prisoner if he have anything to say why sentence should not be pronounced, is not such an irregularity as will entitle the accused to a new trial.

9. Where the law confides to the Court the discretion to inflict the death penalty or some milder punishment, it must be an extreme case to induce or even warrant this Court in interfering with the sentence.

Indictment for an attempt to poison, in Harris Superior Court. Tried before Judge WORRILL, at April Term, 1859.

Sarah, a negro woman slave, the property of Benjamin Williams, was indicted for feloniously, unlawfully and

Sarah (a slave) vs. The State.

maliciously furnishing, giving and administering "a certain poison, to-wit, three grains of strychnine and arsenic, knowing them to be deadly poison, to one John Williams, with intent then and there, him the said John Williams wilfully, unlawfully, feloniously and of malice aforethought, then and there to poison, kill and murder."

The defendant pleaded not guilty, and the following is a brief of the evidence:

### Evidence for the State.

*John Williams* testified, that on the 6th October, 1858, he ate breakfast at the house of Benjamin Williams, his father, with the family, took a piece of meat, fried ham, on his plate and ate it, it tasted very bitter, his father also took a mouthful and said it was poisoned; rose from the table and told all to eat no more of it; witness did not suppose it was so; by this time had taken a cup of coffee, which he found more bitter than the meat; witness rose from the table and left; also took a mouthful of bread, which was also bitter; the other members of the family complained that the victuals had a bitter taste, two were made sick; then a piece of bread, the same witness ate of, was given to a dog, piece as large as his fist, and before the dog finished eating half of it he died, dropped dead in his tracks; immediately after eating, witness became sick at the stomach, not much so; there was a burning sensation, felt weakened and relaxed in his limbs, so much so that he could not stand up, and had no use of himself. Sarah, the prisoner, was the cook, cooked the breakfast that morning, she did not eat anything; his father asked asked her if she drew water that morning, she replied she did not, for she did not have time to do it; does not know where she got the water, heard her say she got the water, out of the well bucket, she cooked breakfast with, but did not draw it.

*William Nelson* testified that he being informed that

Sarah (a slave) vs. The State.

Mr. Williams' family was poisoned, went over and found Doctor Fonville there, who had given them medicine, all seemed to be quite sick; saw the dog at the kitchen door, dead; the doctor, after giving the medicine, went to where Sarah, the prisoner was, and beckoned to witness to come to him; told witness she had confessed that she had white powders, and would go and look for them; went with them to the gin house lot, where prisoner took from under the bottom rail of the fence, a paper with white powder in it. The doctor opened the paper and tasted it, showed it to witness, he has kept it ever since, (produced in court, and swore that it was the same paper of powders that prisoner took from under the fence) recollects that she said it was the remainder of the powders.

*Dr. Hatchell* testified that he had examined the powders produced by Mr. Nelson in court; heard Williams describe his symptoms, thinks they were produced by strychnine, thinks the powders are strychnine, examined them the day the family were poisoned; strychnine is a deadly poison.

*James G. Smith* testified that about 7th October last, hearing that Williams' family were poisoned, he went over and found several of the family sick, saw the dead dog; did not hear the prisoner confess that she poisoned the family; when interrogated whether she did the poisoning, she would say that Howell was there the night before. Witness asked her what part of the breakfast was poisoned, she replied the bread, meat, coffee and all were poisoned.

### Evidence for the Defence.

*William Howell* testified that he was at the house of Benjamin Williams the night before his family were poisoned, he drew a bucket of water that night and put strychnine and arsenic in it; no one saw him do it, it was about one or two o'clock at night; did not tell Sarah

he was going to put the poison in the bucket. He had given Sarah poison before to put in the bucket, but she would not do it; did not·tell her he was going to put the poison in the bucket.

Upon this testimony and under the charge of the court, the jury found the defendant guilty.

Counsel for· prisoner moved the Court for a new trial on the following grounds:

First. Because the Court erred in allowing said slave to be tried by a jury taken from the grand jury list, notwithstanding counsel for prisoner consented thereto.

Second. Because the jury after being out sometime, were, by consent of the Solicitor General and counsel for the prisoner, brought into court, and the court, both counsel consenting, read over the testimony as taken down on the trial.

Third. Because the witness Nelson stated portions of prisoner's confessions after he had stated that he had heard that she had been whipped that morning by her master for the offence, counsel for prisoner remarking at the time that at the proper time he would move to withdraw said testimony from the consideration of the jury, but did not make the motion.

Fourth. Because of newly discovered evidence, which was not known to prisoner's counsel until after the trial.

Fifth. Because when the witness, Nelson, was about to state what Dr. Fonville said when he examined the powders, prisoner's counsel objected. The Solicitor General replied that he went into the trial under the impression that Dr. Fonville was in court, but that he had just been informed that he had gone home, six or eight miles off.

The presiding Judge remarked that he would continue the case if he desired it, when counsel for prisoner consented that the witness might state what Dr. Fonville said, remarking that he would admit the evidence rather than have the case continued. Whereupon the witness

Sarah (a slave) vs. The State.

stated that Dr. Fonville tasted the powders and said that it was bitter, and handed them to witness.

Sixth. Because the verdict is against the weight of evidence.

Seventh. Because the sentence pronounced upon the prisoner, by the Court, is more severe than authorized by the evidence.

Eighth. Because after the witness Howell had been examined and confessed that he put the poison in the well bucket, the court suspended the proceedings, and in the presence of the jury, sentenced witness for the crime "of attempting to procure a negro to commit the crime of poisoning." (Howell having been previously convicted, at the same term, of said offence.) The Judge remarking to him that he intended to sentence him to five years imprisonment in the penitentiary, but after his open and bold confession, he would sentence him for seven ye irs, and if he had the authority he would sentence him for fifty years.

The Court when charging the jury, remarked: "Gentlemen, a word in reference to the testimony of the witness, William Howell, introduced in behalf of the defendant; he has confessed his guilt of the most diabolical crime known to the laws of society, it is for you to attach such credit to his evidence as you in your judgment may think it deserves."

After argument, the Court overruled the motion for a new trial, to which decision counsel for the prisoner excepted, and assigns the same as error. The counsel for prisoner filed the following further exceptions to the rulings and decisions of the court:

That the court erred in reading over to the jury the following sentence as part of the testimony of John Williams, to-wit: "Thinks she drew the water that morning," it appearing after the verdict, that the same was no part of the testimony of said witness, and was inserted by

Sarah (a slave) vs. The State.

mistake; and in reading to the jury and using the word "remainder" as part of the testimony of William Nelson, when he used no such word, but the word "*balance.*"

That the court erred in taking down the testimony itself, and in not appointing some one else to act as clerk.

That the court erred in not calling on the prisoner or her counsel to say what she had to say why the sentence of the law should not be pronounced upon her.

D. P. Hill, for plaintiff in error.

W. D. Elam, Sol. Gen. pro. tem., *contra.*

Judge Stephens absent.

*By the Court.*—Lumpkin, J., delivering the opinion.

1. Was it error in the court to allow the prisoner to be tried by a jury taken from the grand jury list, by the consent of both counsel for the State and the prisoner? We think not.

And we lay down the broad proposition that as a prisoner may waive even a trial itself, and be capitally punished upon his own confession of guilt, he may waive any minor right or privilege. The greater including the less. Besides, by the act of 1856, all persons between the ages of twenty-one and sixty are qualified to serve as jurors in criminal cases. There is, therefore, no legal disqualification attached to any of the jurors who tried this case. Perhaps a jury taken from the grand jury list is the best that could be selected to try a slave. A slave has no peers or equals by whom they can be tried. He finds his best security in the grand jury box.

Again; it is only "on request" that the court will supply a full pannel from which a jury in a criminal case is to be selected. Suppose the prisoner even when accused of a capital felony, should consent to be tried by either pannel of the petit jury in attendance on the court, no one

we apprehend, would question the legality of the verdict.

2. Here, again, we have an exception to an act done by the consent of parties. It is binding, and the prisoner must abide by it. As the witnesses had dispersed, there was no irregularity in it anyhow. As the jury were not distinct in their recollection of the proof, it was the proper mode in the absence of the witnesses, of refreshing their memory.

3. We see no objection to the testimony of William Nelson. What if the negro had been whipped by her master the morning before she made the confessions, as proven by the witness, that does not make her voluntary confessions to Nelson subsequently, objectionable. Besides, counsel should have moved to withdraw the testimony if it was illegal, and the excuse he renders for not doing so, is hardly satisfactory.

4. The showing made by Mr. Hill, as to the newly discovered evidence, is not sufficient; the fact is not verified which he expects to establish on another trial. Who was his informant, and where is his affidavit? But more than all, where is the affidavit of the prisoner herself, that she did not know of the facts proposed to be proved at the time of the trial? If they existed, she necessarily knew them, and should have communicated them to her counsel. They related to her condition at the time she made the confessions testified to by Nelson.

5. There is nothing in this objection. The testimony amounted to nothing. But be that as it may, the prisoner's counsel consented to its introduction.

6–7. These two assignments may be disposed of together. The sum and substance of the ojection is, that the whole conduct of the Court was calculated to disparage the credit of the witness Howell. It may be that the presiding Judge yielded to the excitement of the moment, elicited by the bare-faced confession of Howell, evidently made to screen his guilty paramour; still he did not vio-

late the statute which forbids the Judge to express or even intimate an opinion as to what has or what has not been proven; or as to the guilt or innocence of the prisoner at the bar. This being so, the Judge must be left to his own sense of propriety as to what is due to himself as well as the prisoner on such occasions.

8. If the mistake in the testimony, as read to the jury, was of a character to make it material to the conviction, we should deem it our duty to grant a new trial, notwithstanding the counsel of the prisoner was present and made no objection as to its accuracy. But it is very slight. The witness Williams says, "he thought the girl *drew* the water that morning." He is not certain. If the poison was deposited in the water, it was worse for her that she did draw it. Howell says he drew it the overnight, and put the poison in it unknown to prisoner. After all, the evidence is so uncertain and immaterial, and the evidence of the defendant's guilty participation in this wanton and diabolical crime so satisfactory, without the proof, that we do not think the case should be sent back, notwithstanding the oversight of the Court and the prisoner's counsel, relative to the matter.

9. It was not error in the court to take down the testimony; and so this court has heretofore decided.

10. The ancient practice was for the court to call on the prisoner, if he or she had anything to say why sentence should not be passed. It originated at a time when prisoners were not allowed the benefit of counsel, and when the court was counsel for the prisoner, so far as to see that he was deprived of no legal right. Besides the benefit of clergy was also allowed; and at this stage it was claimed. This is expressly abolished by our penal code.

Our penal code prescribes with some minuteness the formula to be observed in the trial of criminal cases. No allusion is made to this ancient ceremony. Prisoners represented by counsel, as they now are, lose no right by

the omission. One of the reasons assigned in the books for the observance of the practice is, that a motion may be made in arrest of judgment. These motions are made daily, and always before the prisoner is called up to be sentenced.

Here a new trial was moved for. In the order of pleading, this follows the motion in arrest of judgment, and, therefore virtually overrules it. All the grounds against the judgment are taken in the motion for a new trial. If she had a pardon, or should even obtain one afterwards, it would be available even under the gallows. Had it been made to appear that the prisoner had lost any right by the failure of the court to observe this ceremony, relief would be extended.

11. We are satisfied beyond a reasonable doubt that the defendant is guilty, and that the verdict is in accordance with the proof; and the court below was right in refusing a new trial.

12. Is the punishment inflicted disproportioned to the offence, inasmuch as no one was killed? The law has left it discretionary with the court to inflict the death penalty or some milder punishment for this offence. It considers the extreme penalty sometimes justifiable. If the defendant be guilty, and the testimony and the verdict establish the fact, can we conceive of a more aggravated case? An attempt is made to cut off by one fell swoop the whole family from among the living. And that too, without the slightest provocation!

When we consider the facility with which this crime may be committed, the temptation to its perpetration, either under the influence of temper and revenge, or urged to it by base men to accomplish their own wicked and corrupt purposes; in a clear case of guilt the stroke should not be averted. It is due to the living that one so depraved should not be spared.

Judgment affirmed.