1. A defendant who is charged with a felony, and upon the call of his case for trial files a written waiver of his right for a jury trial and demands that he be tried by the court without a jury, can not compel the court to so try him, and it is not error for the court to overrule such demand.
2. Where a person was on trial for murder by the killing of a city policeman while attempting to arrest the accused for drunkenness, on the street, and the validity of the arrest was germane to the issues involved, it was not error for the court to permit the State to introduce in evidence a city ordinance making it unlawful for a person to be drunk on the streets.
3. Where a person was on trial for the homicide of a city policeman, growing out of an attempted arrest for drunkenness, and the State introduced in evidence a city ordinance making it unlawful for a person to be drunk on the streets, it was not error for the court to charge the jury that the ordinance was legal and made it an offense against the city for any one to appear upon the streets intoxicated; said ordinance having been in force at the time of the homicide.
4. In the trial of a case as above indicated it was not error for the court to charge: "If you find the defendant was arrested without a warrant, . . if you find that the defendant was illegally arrested, then you would not be authorized to find him guilty of an offense higher than voluntary manslaughter;" said charge being more favorable to accused than the law required.
5. In the trial of a case as above indicated it was not error for the court to charge: "I charge you that a violation of a city ordinance is a crime, for which an arrest may be made by the proper officer."
6. The charge dealt with in the corresponding division of this opinion clearly referred only to an arrest by officer Denby; and whether in view *Page 662 
of the charter provision this charge would have been correct if the defendant had been on trial for the killing of officer Denby, he was as a matter of fact being tried for the killing of officer Henderson, a separate and distinct transaction; and while the charge was inapplicable as related to the latter transaction, it was not calculated to confuse the jury, or otherwise result in harm to the defendant, for any of the reasons assigned.
 No. 14462. APRIL 13, 1943.
Joel Luther Palmer was tried for murder, and was sentenced to electrocution. The killing took place on Main Street in Tifton, on Saturday July 18, 1942, late in the afternoon and at a time when the streets were crowded. Palmer was tried for killing Joe Henderson, chief of police. Within a few minutes before Henderson was killed the accused had killed another policeman, Mercer Denby. There is some dispute in the evidence as to the exact circumstances in which Denby was killed; and there is a variation in the evidence as to the precise condition prevailing at the time Henderson was killed.
The evidence disclosed that the accused, a soldier on leave and visiting home, came into town that afternoon with his half-sister who was driving the car. The car was parked on the east side of Main Street, about a block north of the railroad crossing, at a point near Jinnette's Sandwich Shop. After parking the car the half-sister got out, leaving the accused in the car, and went north to a point on the east side of main street near the Tifton Clothes Shop, at which point policeman Denby was standing talking to his father. At the time the policeman was dressed in "the usual officer's uniform that he wore when patrolling the streets." The half-sister approached policeman Denby and said: "Come down this way a piece." The policeman joined the half-sister, and they walked back south toward the car in which the accused had been left. There is no evidence as to what was said between the half-sister and policeman Denby, but they proceeded to the place where she had parked the car, and as they arrived there the accused came walking from the side of the automobile and met them. What was said between the accused and Denby does not appear in the evidence. The half-sister was not a witness in the case.
The first evidence of any difficulty was that there was a scuffle between the accused and Denby. They fell to the sidewalk and *Page 663 
the policeman took a pistol from the bosom of the accused. The policeman then took both of the arms of accused, pulled them behind his back, and walked him in this manner south across the railroad-tracks. The accused was heard to say: "Don't hold my hands so tight. I am not going to fight any more." They walked in this manner until they reached the south side of the railroad at a point on Main Street near a cigar store. At this point the accused jerked away from the policeman, and they engaged in a struggle. During the struggle the policeman's pistol fell out of the holster, and accused picked it up. At this point there is a dispute in the evidence, the State claiming that the accused shot the policeman without cause, and the accused asserting that at the time of the shooting the policeman had struck him with a blackjack and was attempting to strike him again. This shot killed policeman Denby, and as a result of this scuffle and shooting considerable commotion was created among the crowd upon the streets, and the subsequent killing of chief of police Joe Henderson immediately followed.
At the time of the shooting of Denby, Chief Henderson, P. G. Burke, and Alonzo Ross, State patrolmen, were in conversation on Main Street, but about one block south of where the shooting took place. Immediately after the shooting some one on the sidewalk said, sufficiently loud for it to be heard by these three officers "somebody is shooting in the street." Burke and Ross proceeded to the scene of the shooting by going up the sidewalk, and Joe Henderson got out into the street just behind the automobiles parked along the east side of Main Street, and went to the scene of the shooting by that route. No one seems to have testified just when Chief Henderson reached the scene; but from the testimony of officers Burke and Ross he must have reached the scene about the same time as Burke and Ross, as Ross testified that when he reached the scene "we looked and saw Palmer [accused] waving a pistol, and he throwed it up and shot, and the sign fell out and some of the glass fell on Mr. Burke's head. That was just time we got there, and we stepped off the sidewalk, and we heard another shot, and we started towards where I saw Chief Henderson come out from behind the third car. . . He was coming out and going down to the next car. . . I started down there, and Joe [Henderson] was standing sort of crouched rather, with his *Page 664 
pistol, and he shot him. Palmer shot and Joe shot, almost together, and Joe says, `Oh, my God, I am shot.' . . I couldn't shoot him, there was so many people there. . . When he shot Mr. Henderson he was over here on the tracks, approximately forty-five feet from where Joe Henderson fell. . . When Mr. Henderson and Palmer exchanged shots at the time . . Henderson was killed, the shots were fired almost together. . . Palmer shot first, and Joe immediately followed him."
Officer Burke testified: "Just as I appeared around the corner in open view of Palmer [accused], this shot was fired and the glass fell. I would say the shot struck the neon sign some eighteen inches above my head. . . And I come out behind the car on the street, and just as I got out back of the car was the first shot I saw Chief Henderson and Mr. Palmer exchange. . . Then Chief Henderson moved down north, and they exchanged another shot and Chief, he fell right at my feet. . . I had on my uniform on this occasion. . . At the time he fired into the neon sign, I saw Mr. Palmer, and he was backing up Love Avenue, north, toward the railroad, and he had a pistol in his hand. It was after he shot out the neon sign that I saw him exchange shots with Joe Henderson. I couldn't say where the chief was at the time Palmer shot the neon sign. . . I [heard] several more shots fired, and I knew others were shooting besides Chief Henderson and Mr. Palmer, but I didn't know who else was shooting."
John Duffy, a deputy sheriff, testified that at the time of the first trouble, when policeman Denby and the accused were scuffling, he was in the cigar store, and after hearing a shot in front of the store he went to the door and stepped outside. At this time policeman Denby had been shot and was coming in the front door. "Mr. Palmer was facing north, and he threw the gun in my face, and I stepped back in the door, and he went on. . . I couldn't shoot him, there was so many children out there in cars and people on the street; but I stepped out on the street trying to get a chance to shoot Mr. Palmer, but I couldn't get a chance to shoot, and he shot at me but he didn't hit me; the shot went high and hit the neon sign. . . Palmer shot in my direction, and I thought he was shooting at me. . . I didn't see Mr. Henderson, but I heard a gun shoot, and I heard a second shot fired, and then I heard — may be a second passed, and I heard a couple more shots, *Page 665 
and Mr. Palmer turned and trotted down the sidewalk, and I saw Mr. Henderson slide off the fender of an automobile."
There was additional evidence as to what transpired following the shot that killed Chief Henderson. There was other shooting by the officers, and one additional shot fired by the accused. The accused retreated, and was arrested near the scene of the killing of Chief Henderson. The accused received three or four bullet wounds, as testified to by Ross: "He was wounded — he had a bullet wound in his right leg, the upper part of the calf of the leg, below the knee cap — I didn't see the exact spot; and he had one bullet in his arm here and one in the fleshy part here, and there was one up here under his eye — left eye — it looked like a bullet had cut there; there was a contusion under his left eye." Following his arrest he said his sister was the cause of the trouble, and he hoped he had put a bullet in her heart, and if he got out he would put one through her; and when told that he had shot two policemen he remarked: "Well, ____ them, if he didn't get them he would get them when he got out." There was evidence of other remarks of a similar nature, illustrating the state of mind of the accused after his arrest. There was evidence that, when arrested immediately after the shooting, the defendant had been drinking. John Duffy testified: "From my observation of his condition as to being drunk or sober, I would say he was drinking. I would not say he was drunk — he could get about too good, but he was drinking." Lennox Henderson testified: About an hour after the shooting, "the defendant's condition as to being drunk or sober — well, now, he was not staggering drunk — he had been drinking, evidently, for you could smell it."
Alonzo Ross testified: "I arrested Palmer right there. . . As to whether he was drunk or sober, he was drunk. I say that because he was staggering, and I could smell intoxicating beverages on his breath. He made a statement about his condition; it was made freely and voluntarily; he said he had been drunk about four days, and he didn't know what he was doing — that he was crazy. He said he knew Chief Henderson. . . I would be willing to swear he was intoxicated, outside of the fact he told me he had been drinking; he was intoxicated."
The evidence does not disclose any fact to show that at the time Chief Henderson arrived on the scene he had any information that *Page 666 
policeman Denby had been shot. The other two officers who had been with the chief at the time the first shot was fired, and who reached the scene about the same time as the chief did, testified that they did not know that policeman Denby had been shot until they went to the hospital shortly after the entire affair was over. Immediately after being shot, policeman Denby went into a store. At the time of the shooting Chief Henderson was wearing a blue police uniform, and after the shooting the accused stated to officer Alonzo Ross that he knew Chief Henderson.
The evidence is confused as to whether the accused fired once or twice at Chief Henderson. C. C. Henderson, Jesse Blanchett, and P. G. Burke testified that both the chief and the accused fired twice at each other. The record seems to disclose definitely that Henderson fired twice; but there is a dispute among the State's witnesses as to whether the accused fired more than one shot at Henderson. There is no dispute that all shooting done by the accused was done with the pistol that was taken from policeman Denby at the time of the scuffle just before Denby was shot; the second shot was the shot made at either Burke, Ross, or Duffy, and struck the neon sign; and after Chief Henderson was killed, the accused fired a shot at Alonzo Ross, who had followed him about a hundred yards from the scene of the shooting and arrested him. Ross testified, after examining the pistol, that only four shots had been fired from it.
It will be recalled that before any of the shooting, and when the half-sister brought policeman Denby down to the car where she had left the accused, the father of policeman Denby testified that the policeman took a pistol from the bosom of accused, and put it in his own hip pocket. There is no reference in the evidence as to what became of this pistol.
The accused introduced three witnesses, his stepmother Mrs. Allie Palmer, Captain Leland R. Tozier, and Sergeant John Kryszewski, and made a statement to the jury.
His stepmother testified: "The mind of . . [accused's] father is not good. . . He don't remember things that he does. . . His mind ain't right. That condition has existed for fifteen years. . . He would not remember what he had done. . . This defendant has a second cousin on his father's side, who is in the asylum at Milledgeville. . . He has one cousin who went *Page 667 
crazy from drinking. . . He had another cousin on his father's side, who died in the asylum. The defendant went to the fourth grade in school. . . He is now twenty-eight years old. . . His mind is not good, just like his father's. . . He would do things one day, and not remember the next day that he had done them."
Captain Leland R. Tozier testified: "I am a captain in the United States Army. I have been associated with the army for sixteen years." Here the witness gave two illustrations of instances of men in the Army going insane from strain they have undergone in military camps, and due to transition from civil life to military life. "I would say that it is possible for a man from practically any walk of life to go insane, caused by his service background; . . the . . rigors imposed by military life, the fear of death and the fear of leaving home and loved ones. . . Individuals . . become temporarily unbalanced, due to excitement and the thought of personal danger. In some cases it has been recorded that permanent mental injury has resulted." The witness was not a doctor, but had taken a course in psychology in Clemson College.
Sergeant John Kryszewski testified: "Joel Palmer . . is a member of my organization, the 67th Service Squadron. . . I have noticed something peculiar or odd about Joel Palmer. . . Palmer came to me and asked for a pass. I told him he could not have a pass. . . He just flared up, his eyes flashed, and he began to give me back talk. . . The next morning Palmer came in and asked for a pass, and he was just as nice as could be; he did not seem to remember anything about having asked for the pass the day before."
The accused made a statement, a part of which was reduced to writing, as he said he "couldn't remember all this case all the way through . . for my mind comes and goes so bad. . . For a long time I did not remember anything about it. . . I was in Tifton this Saturday morning, and I went back to Omega where my half-sister lived. I had been drinking hard for two or three days, and I had overstayed my leave from the army. I was just as nervous as I could be, just like a man always is after he has quit drinking and was sobering up. My sister drove the car to Tifton and stopped it in front of that little sandwich shop, . . *Page 668 
and my sister got out and left me. . . I decided to get out of the car. I was just as sober as could be, but I was mighty nervous. . . Just after I left the automobile, somebody . . came up to me and shoved me . . back . . and I fell down. My head hit the pavement, and it knocked me out for a while. When I came to, Mr. Denby was on me. When he let me up, he began shoving me down the street and bending my arms up behind my back. . . The more I begged the harder he twisted my arms. When we got over the railroad . . he gave my arms a hard jerk, . . it threw me off my balance, and I fell, . . pulling him down with me, and the pistol fell out on the ground; both of us reached for the pistol and I got it. Mr. Denby hit me with his blackjack as I was backing away from him, . . and he was trying to hit me again with it. I shot to protect myself. About that time it looked like everybody was coming after me, and I was backing off. Somebody was shooting at me from behind a car. I couldn't tell who it was, but I shot towards the car at the man shooting at me, and I suppose that was when Mr. Henderson was hit. I didn't know Mr. Denby, . . but I had known Mr. Henderson."
The accused then stated, that he had come back to see his father, who was sick; that he was worried, had got to drinking, and was a.w.o.l. from the army; he was not doing anything when arrested, didn't know Denby was an officer; that he had no warrant. The accused then denied making any statements to the officers after being arrested. The exception is to an order overruling his motion for new trial.
1. At the time this case was called for trial the accused tendered to the court a written demand for a trial by the court without the intervention of a jury, waiving his constitutional right to be tried by a jury, and demanding to be tried by the court. The court overruled this demand, and the accused excepted to this ruling. In support of this contention the accused citesGreen v. State, 6 Ga. App. 324 (64 S.E. 1121); Hollis v.State, *Page 669 118 Ga. 760 (45 S.E. 617); Wadkins v. State, 127 Ga. 45
(56 S.E. 74); Moore v. State, 124 Ga. 30 (52 S.E. 81). None of these decisions is authority for the position the accused takes. The Moore and the Hollis decisions merely held that a defendant may waive the right of a jury trial. The Green and the Wadkins decisions held that the defendant had a right to demand a trial by the court; but these two cases were so determined because the acts creating the two city courts in which they were tried specifically gave the defendants that right. Neither is the ruling announced in Sarah v. State, 28 Ga. 576, authority for this position. In that case it was held: "As the prisoner may waive even a trial itself, and be capitally punished upon his own confession of guilt, he may waive every minor right or privilege. The greater includes the less, or the whole the parts." Each of the foregoing cases deals with the right of a defendant to waive that which has been established for his benefit. There is a difference in a defendant waiving a right he possesses, and in demanding a privilege for which there is no right provided. The Code, § 102-106, stating "A person may waive or renounce what the law has established in his favor," does not authorize a defendant to demand that his case be tried by the judge. A similar question was presented to the Court of Appeals in Sammons v. State, 53 Ga. App. 369 (185 S.E. 923), where a person charged with a misdemeanor demanded a trial by the court without a jury. This demand was made in a superior court, where no question was involved as to whether an act creating a city court permitted such demand; and the Court of Appeals held that it was not mandatory on the judge of the superior court to try a misdemeanor case without a jury. We hold that the same rule applies to felony cases, and that the court did not err in refusing the demand of accused to be tried by the court without a jury.
2. We will take up the special grounds of the motion (four, five, six, seven, and eight) out of their regular order. The eighth ground alleges error in the court's admitting a municipal ordinance of the City of Tifton (section 104 of chapter 9 of the Code of Tifton, dated 1907), as follows: "It shall be unlawful for any person to be intoxicated on the streets; or for any person, whether intoxicated or not, to become so boisterous or disorderly as to disturb the public, or to be found lying intoxicated or asleep on the streets or alleys or other public place of the city, or on any porch *Page 670 
or steps of any house within the limits of the city." Objection was made to the introduction of this ordinance, on the ground that it was irrelevant, immaterial, and illegal, and that it was an effort to legislate on a subject-matter that is controlled by State law, and because it makes intoxication penal, without prescribing a method by which said intoxication can be determined. The evidence was not subject to any of these objections, and there was no error in its admission.
3. Under ground 5 error was alleged on account of the court's charging as follows: "And, right in this connection, I will state that there has been offered and admitted in evidence an ordinance of the City of Tifton, which the court holds to be legal, which makes it an offense against the city for any person to appear upon the streets intoxicated." Error was assigned on the ground that this ordinance was passed by the city in the year 1907, and that a new charter was granted to the City of Tifton in 1920, and that the act creating the new charter made no provision for revalidating previous ordinances, but in fact repealed all former ordinances.
We do not think the charge was subject to the objection interposed. The act granting a new charter to the City of Tifton (Ga. L. 1920, p. 1626, § 1) provides: "That from and after the passage of this act, an act entitled an act to incorporate the City of Tifton, approved August 16, 1915, and all acts amendatory thereof be and the same are hereby consolidated into and superseded by this act, and all provisions of former acts inconsistent with or at variance with this act or any provisions hereof are hereby expressly repealed, and all laws and parts of laws in conflict with this act be and the same are hereby repealed." This section is identical with Ga. L. 1915, p. 854, § 1, where a new charter was obtained by the City of Tifton to supplant a charter granted by an act to incorporate the City of Tifton. Ga. L. 1902, p. 642. This ordinance enacted in 1907 accordingly was preserved and kept in force through the two above-mentioned acts of 1915 and 1920.
4. The objection under ground 6 was to the charge of the court, viz.: "I charge you that if you find the defendant was arrested without a warrant, and that at the time of his arrest he was not committing a crime in the presence of the arresting officer, or that he was not endeavoring to escape, or that there were not other facts which would have justified the arrest: in other words, if you *Page 671 
find that the defendant was illegally arrested, then you would not be authorized to find him guilty of an offense higher than voluntary manslaughter, even though you find that an actual, physical assault was not committed against him, and even though you find that officer Denby had no blackjack or hit him with a blackjack." This charge was not error for any reason assigned. It was more favorable to accused than the law required.
5. The charge of the court stating "that a violation of a city ordinance is a crime for which an arrest may be made by the proper officer," is a correct statement of the law, and is not error.
6. Under ground 4 the accused contends that the court erred in charging the jury as follows: "If you believe, from the evidence in this case, that the policeman, Mr. Denby, arrested or undertook to arrest the defendant without a warrant, you should look to the evidence to determine whether the defendant committed an offense in the presence of said policeman, Denby, or whether, from the evidence, the defendant endeavored to escape, or whether there was other cause, which made a failure of justice likely; and if you find that the evidence in this case does not authorize the finding, in either instance, then I charge you that you should find the arrest of the defendant in this case to have been illegal. That theory of law has been fully debated and argued in the presence and hearing of the jury, the State contending, on the occasion under investigation, the defendant Joel Palmer, who is now on trial, violated a city ordinance in the presence of officer Denby, and that he was therefore under legal arrest; and the defendant contending such was not the case, that no crime had been committed in the presence of the officer, and therefore that the arrest was illegal. However, you may consider this principle of law in connection with the case." The objection to the foregoing charge is: (a) that it placed the violation of a State law and a violation of a city ordinance on the same basis; (b) and that it was not adjusted to the evidence in the case, in that there was no evidence whatever that officer Denby had a warrant; (c) that said charge placed an improper limitation upon the defense, for the reason that the charter of the City of Tifton required that to arrest without a warrant the offense must have been committed "in the immediate presence of such officer" and "the offender is about to escape." *Page 672 
Under this ground the Supreme Court is divided in its opinion. The majority of the Justices authorize the writer to state their opinion as follows:
The Code, § 27-207, provides: "An arrest for a crime may be made by an officer, either under a warrant, or without a warrant if the offense is committed in his presence, or the offender is endeavoring to escape, or for other cause there is likely to be a failure of justice for want of an officer to issue a warrant." This court has held that a policeman under city ordinance is as much under the protection of the law in making an arrest as any public officer, such as sheriff, bailiff, or constable. Johnson
v. State, 30 Ga. 426; Harrell v. State, 75 Ga. 842;Thomas v. State, 91 Ga. 204 (18 S.E. 305); Porter v.State, 124 Ga. 297 (52 S.E. 283, 2 L.R.A. (N.S.) 730);Yates v. State, 127 Ga. 813 (56 S.E. 1017, 9 Ann. Cas. 620); Graham v. State, 143 Ga. 440 (85 S.E. 328, Ann. Cas. 1917A, 595); Faulkner v. State, 166 Ga. 645
(144 S.E. 193). A town marshal has the right to arrest a defendant, without a warrant, for a violation in his presence of a town ordinance.Glaze v. State, 156 Ga. 807-813 (120 S.E. 530). The charge clearly referred only to an arrest by officer Denby; and whether in view of the charter provision this charge would have been correct if the defendant had been on trial for the killing of officer Denby, he was as a matter of fact being tried for the killing of officer Henderson, a separate and distinct transaction; and while the charge was inapplicable, as related to the latter transaction, it was not calculated to confuse the jury, or otherwise result in harm to the defendant, for any of the reasons assigned.
The writer does not concur in the above opinion of the majority of the court, his views being as follows: The authority stated in the foregoing majority opinion is sound law, and should apply in all cases unless there is some legal curtailment or limitation placed on the right of some particular officer to make an arrest, which limits the rules set forth above. This entire case seems to have been tried by the attorneys and the court on the theory that the only incident that would determine the legality or illegality of the arrest was the initial arrest by officer Denby on the ground the accused was drunk, which violated the municipal ordinance. No reference is made in the charge of the court that would have permitted the jury to pass on the legality of the arrest by officer *Page 673 
Denby on the ground that the accused was violating the State law by carrying a pistol either concealed or without a license. Nor was there any reference in the charge that authorized the jury to pass on the legality of an arrest or an attempted arrest of the accused by Chief Henderson, by reason of the accused shooting at another officer (when the neon sign was struck), in the presence of Chief Henderson.
The accused insists that the original arrest by officer Denby was not a legal arrest, for the reason that the charter of the City of Tifton does not give to the policemen of that city the authority to arrest without a warrant for a violation of a city ordinance which is committed in their presence, unless the accused is also attempting to escape. Ga. L. 1920, pp. 1625, 1642, § 35, being an act of the legislature granting a new charter to the City of Tifton, provides: "Be it further enacted, that in no case shall the marshal or any policeman of said city make any arrest of any person charged with the violation of any of the ordinances of said city without having first procured from the city clerk, or other person authorized to issue the same, a warrant for the arrest of said offender, unless said offense is committed in the immediate presence of said officer and the offender is about to escape, in which event he may arrest and detain such person until a proper warrant can be secured authorizing the offender's further detention."
Had the above-quoted section been an ordinance passed by the mayor and council, it would not have been the duty of the court to take cognizance of it unless it had been introduced in evidence. McDonald v. State, 152 Ga. 223, 227
(109 S.E. 656); Griffin v. State, 183 Ga. 775, 779 (190 S.E. 2), and cit. But this is not a municipal ordinance. It is an act of the legislature. The Code, § 38-112, provides that "all laws . . of the General Assembly . . shall be judicially recognized without the introduction of proof." See Davis v. Bank of Fulton,31 Ga. 69; Terry v. Merchants and Planters Bank of Savannah,66 Ga. 177, 178; Stanley v. Sims, 185 Ga. 518, 522
(195 S.E. 439). All the authority of a policeman in the City of Tifton to make an arrest for a violation of a municipal ordinance must be derived from the act of the legislature granting a new charter to that city, which is set forth in the section quoted in the preceding paragraph. His manner of making an arrest without a warrant is limited in accordance *Page 674 
with the provisions of that charter. This mode of making arrests for the violation of a municipal ordinance being prescribed in an act of the General Assembly, and not by an ordinance of the mayor and council, the court should have taken judicial cognizance of this law. There is no evidence in the record that would show that the accused, after being seen drunk on the street by officer Denby, made any effort to escape. When first seen they were "tussling," but there is nothing to indicate any effort of accused to escape prior to this "tussling." In his statement the accused denied any effort to escape, but stated that the first thing he knew "officer Denby came up and shoved me." The charge quoted above, in the first paragraph of the sixth division of this opinion, was designed to cover the law of a legal arrest generally; but it was not adapted to the particular law governing arrest by policemen in the City of Tifton for the violation of a municipal ordinance. While the charge given would have been applicable had the officer arrested accused for a violation of State law, it was not applicable to a violation of a municipal ordinance of the City of Tifton under the charter provision.
The law of justifiable homicide, or self-defense under the fears of a reasonable man, as contained in the Code, §§ 26-1011, 26-1012, was not given in charge. The only defense available to the accused, under the charge of the court, was the right to defend against an illegal arrest. Inasmuch as the evidence for the State did not show facts to establish a legal arrest, and the statement of the defendant did enumerate circumstances that amounted to an illegal arrest, and the court having charged on the subject of a legal and illegal arrest, it was the duty of the court to apply the proper rule. "When the judge of his own motion undertakes to charge the law arising on a state of facts as given by the accused in his statement, the charge so given must be correct law and applicable to the theory of the defense made by the accused in his statement." Ragland v. State, 111 Ga. 211,214 (36 S.E. 682); Richards v. State, 114 Ga. 834
(40 S.E. 1001).
Judgment affirmed. All the Justices concur, except
BELL, P. J., and ATKINSON, J., who dissent from the ruling announced in the sixth headnote and the corresponding division of the opinion.