1. A defendant being tried for murder has a right to have the jury kept together throughout the entire trial of his case; however, he may waive this right. Where the accused in such a case, before its submittal to the jury, agreed through his counsel, at a private conference between the judge, the solicitor-general, and all of his attorneys, that the jury might be dispersed for the night under instructions from the court, which were given, he will not be heard to complain for the first time after verdict, and on his motion for new trial, that the consent for the dispersal was given because the trial judge, at such conference, stated, "If you are not willing for me to disperse the jury, I will complete the trial tonight." This statement, made in these circumstances, does not amount to such duress as will relieve the accused from the consent so given.
2. Where photographs and physical evidence (two shotguns) are introduced in evidence by the State, an instruction — "You take the law as given you in charge by the court, the evidence from the sworn facts in the case, and the defendant's statement, and from the law so given and the facts thus ascertained, you as honest, conscientious, fearless, and impartial jurors, ascertain the truth of this case and let your verdict honestly and courageously speak it" — is inaccurate but, when considered in connection with the further and later charge — "Now, gentlemen of the jury, you take this case and apply the rules of law to all of the facts and circumstances, including the defendant's statement" — is not erroneous on the ground that it only submitted to the consideration of the jury the sworn facts in the case, and excluded the exhibits, and had the effect of withdrawing from the consideration of the jury the oral testimony of witnesses for the defendant concerning such evidence. Standing alone, the excerpt would be subject to the attack made, but *Page 14 
when aided by the further charge becomes no longer amenable to criticism. A charge, torn to pieces and scattered in disjointed fragments, may seem objectionable, but when put together and considered as a whole may be perfectly sound.
3. A motion for new trial based upon the ground of newly discovered evidence is addressed very largely to the sound discretion of the trial judge, and his action will not be controlled by this court unless it is abused. It is not an abuse of that discretion to overrule a motion for new trial based upon the ground of newly discovered evidence which, by the exercise of ordinary diligence on the part of the accused or his counsel, could have been discovered before his trial, or upon evidence which has no probative value except for the purpose of impeachment, or upon evidence which would not likely produce a different verdict should a new trial be granted.
 No. 15278. NOVEMBER 15, 1945.
Elmo Buttersworth was convicted in the Superior Court of Johnson County for the homicide of Hilton Pope and sentenced to serve a life term. The defendant excepted to the overruling of his motion for new trial on the general grounds and three special grounds.
The killing occurred at the home of the deceased, where the defendant (a son-in-law) and his wife also resided. At the trial Gladys McTier, a married daughter of the deceased, testified for the State: That he and his two sons-in-law (Elmo Buttersworth and Junior Souls) returned from Scott, Georgia to the Pope home at from 12 to 12:30 on the night of the homicide; they were all drinking — Junior Souls being so drunk that he could not walk and could hardly talk. The deceased came into the house to change hats; the defendant then came in and told his wife he was going off some place; all three of the men then left the house, got in the car, and were in the act of leaving when the witness told her father to get off the car, which he did. The defendant and Souls became angry with her, began to curse her, and ran her back into the house, throwing tire tools or something at her. Looking back as she entered the house, she saw the defendant and Souls fighting each other; she was in the house for only a short time; a small sister, Pauline, ran through the house and screamed, "Look out Gladys, Elmo is going to shoot you." The witness then left the house by way of the kitchen door, going out back of the house; about that time she heard a gun fire in front of the house, and in a few minutes was told that her father was lying out there dead. She *Page 15 
came around the house, saw her father there on the ground, and asked her mother, who was standing in the yard, if she wanted her to get a doctor. The mother replied, "Yes," and at this time the defendant grabbed the witness by the collar and said: "You are not going anywhere — I done it myself and I take all of the blame. If anybody gets the doctor I will." When she went to her father, she went within three steps or nine feet of him; the moon was shining bright, she could see plainly, but saw no gun by him. She then started off for help, and the defendant caught her and said: "You can come back. I done it and if anybody goes for help I will be the one to do it. I will catch you before you get there." The defendant then went back toward the house, she then went to the home of Mr. Foskey for help, and the defendant, traveling by automobile, reached there about the time she did.
Pauline Pope, also a daughter of the deceased, testified: That she was nine years old and had gone to school five years; she was at home the night her father was killed by Elmo Buttersworth; she thumb-bolted the door to the front room when her father told her to because Elmo and Junior were coming in fighting; Elmo kicked the door open, went to his room and got his gun; her father was in the house then. She told Gladys to run, they ran to the chimney back of the house, and in about five minutes she heard the gun shoot; then she went around where her father was, getting about two steps from him. She could see him, he was lying down; she did not see a gun by him; it was a moonlight night, and if there had been one there, she could have seen it. She did not see Elmo when she went around where her father was, and did not recall whether the truck was still in the yard or not.
Emma Pope, an unmarried daughter of the deceased, testified for the State: That she was sixteen years of age; she was standing by the door on the front porch when Elmo shot her father; her father was standing up in the front yard with nothing in his hands; Elmo had a gun and bent over a chair and shot her father; Elmo stood there a few minutes and then came down where her father was and bent over him; she could not say that he touched him; she did not see her father with a gun. Elmo knew that she was there on the porch, and when he started in the house he pushed her over against the side of the door. On cross-examination she stated: That she did not testify at a previous hearing that her *Page 16 
father had a gun out there that night; and that the first time she went out there she did not go close enough to see whether the gun was out there or not — she wasn't looking to see what was out there. On redirect examination, she testified: That, when she went out the second time she could see her daddy lying out there, the moon was shining, and she didn't have any trouble seeing the gun; but the first time she did not go close enough to see whether the gun was there or not. When her father was shot, he was in the yard and had started around the house; Elmo had just come out of the house; she did not know what Elmo had shot, she could not see her father when he was shot.
Mazie Pope, also a daughter of the deceased, testified for the State: That her mother was standing in front of the front door, and Elmo told her to get out of the way or he would hit her, and she told him to act with some sense. About the time she stepped back, Elmo kicked the door open and went into his room, and she heard him rumbling in the dresser drawer. He "hollered" for Gladys to bring him the light; Pauline told Gladys to run, and they ran around the house, and in about four minutes heard the shot. In about two or three minutes they went toward the front, and Elmo ran out to Junior Souls and said, "That is a Lord's blessing," but she did not know what he meant by that. She went back and stood two or three feet from her father, saw a shape lying there, but could not see him plainly; she could not see a gun if one was there; she never did see one there. She and Gladys then started up to Mr. Foskey's, and Elmo met them "a little piece above the mail box," caught Gladys by the collar, and told her she was not going anywhere, and said, "I done it," and he would take it on himself; then Elmo went back to the house; they got to Mr. Foskey's just as Elmo drove up. Her father had one shell loaded with buckshot, and that was the only one he had that they knew of; her father kept his shells in his trunk, and said all along that the shell loaded with buckshot was the only shell he had; he always used Gladys' gun; she didn't know how many shells he bought in Scott, Georgia. He went to Scott that afternoon; the witness did not know what he got at Scott; Gladys had a 20-gauge shotgun, and that was the gun her father always used when he went hunting; he said he used Gladys' gun because he did not have any shells.
Mrs. Hilton Pope, the widow of the deceased, testified for the *Page 17 
State: That she was at home the night Elmo Buttersworth killed her husband; she lived in Johnson County, and her husband was killed at their home. She was lying on the bed when the car came up, and got up and started to the door when Hilton, her husband, was coming in, and he told her to take his hat and put it up and asked her where his other hat was. She looked in the front room and Elmo was dragging Junior out, and Bernice said to Myrtice, "How did Junior get drunk so quick?" They went out and she heard a noise "like somebody fighting and things hitting the car." She went to the door and it looked like Elmo and Junior were fighting; Hilton came on in the house and she followed, and the door was thumb-bolted. She could not get in and stepped to the edge of the porch; Elmo and Junior were still out there, and Elmo drug Junior nearly to the walk; Junior had hold of Elmo and turned him loose, and Junior said, "Let him go, we'll get him in Scott." Elmo stepped up on the porch and said, "He took my car and now he has my glasses, and I am going to kill him." She thought he was talking about Junior, as they had had some trouble about a car. Elmo then said to her, "God damn it, get away; I had just as soon hurt you as anybody else." She stepped back and he kicked open the door. She decided then to go around the house and go in at the other door; when she got around the house, she heard Elmo call, "Gladys!" She stopped, and in just a few minutes heard the gun shoot; just a few minutes later someone on the other side said, "Elmo has killed daddy." She then said, "Elmo, I wouldn't have thought you would have done it — kill him away from me and these little ones." Elmo said, "That isn't nothing — I'll kill you and the whole family." She then went to her husband, went close enough to lay her hand on him; could see him there, it was "tolerably" light, and she did not see a shotgun lying by him; it was light enough for her to have seen one if it had been there; she could see an object on the ground. When Elmo shot, Junior came back down the road and said, "Elmo, I told you not to do that, you ought not to have done it." Her husband was not mad with anyone that she knew of; he did not act like he was mad when he came into the house; he did not look like a man who was going into the house to get his gun to kill someone. They were all drinking, Junior looked like he had a "right smart in him," and Elmo did too. Elmo got mad with Gladys because she got *Page 18 
Hilton off the car; they were wanting to go off to get some whisky; Elmo and Junior had no money, her husband did. She did not know that the deceased got his gun; she did not know that Elmo and Junior went back in the house after the gun was fired; she did not see them go back; Elmo left there about thirty minutes after the shot was fired; while she was around the house, she thought she would have heard Elmo or Junior if they had gone back into the house; Elmo left after she and Pauline had gone back up the road.
Louis Cochran testified for the State: That the defendant worked for him seven months, was plowing for him; the defendant and his wife would go to his father-in-law's on week ends sometimes, and he carried that gun with him every time he went; but the witness could not say what he carried it for. The defendant said that he had some arrangements with his father-in-law about a hog and arranged to get wire from him to build a pen; that they had some dispute about the hog. The defendant kept talking about it, and said he felt "like killing the son-of-a-bitch," and that Elmo and his father-in-law had some trouble about some "gum stuff." The witness stated on cross-examination that he and the defendant had a misunderstanding about the defendant's work, and that they didn't speak to each other.
Joel Lord testified for the State: That the wound producing the death of Mr. Pope was located in his neck; about a dozen shots entered and no shots were found in his arms or hands. The witness identified some of the clothes that the defendant had on at the time of the shooting.
The State introduced in evidence, without objection, four pictures, some of the clothing of the defendant and two guns; and, over objection, a shotgun shell.
Junior Souls, half brother of the defendant, testified for him: That the witness went to the home of Mr. Pope, the deceased, on the day of the killing, just about dark, and then went to the town of Scott after him and the defendant. They returned at about 11 o'clock p. m.; before getting to the house Mr. Pope's hat blew off, and the witness went back and got it for him. The defendant had some groceries, and started in the house with them; after giving him his hat, the witness did not notice which way Mr. Pope went. The witness and his wife were standing and talking, and had started *Page 19 
back into the house when his wife said, "Let's run, daddy's got the gun." The witness looked up and Mr. Pope was standing just below him with the gun; he and his wife ran up the road, and the next thing he heard Mr. Pope say was, "Halt, Buttersworth, I'm gonna kill you;" he said that two or three times. The witness and his wife ran and were forty or fifty yards up the road when the shot was fired; they stopped when the gun fired, but did not go back down to the house. He had not had anything to drink that night; Mr. Pope had been drinking; the witness had not seem Elmo drinking any, and if he had he could not tell it. They put the car up when they got home; his wife was the only one who came out in the yard. Elmo started in the house with his groceries, and was on the doorsteps when his wife saw Mr. Pope with the gun; Elmo could not run because he had started in the house with his groceries; he did not go back to the house until after the officers came; he did not tell Elmo anything after he shot Mr. Pope; he and Elmo did not throw tools at Gladys and jump on her. The only way Elmo could have run to escape Mr. Pope shooting him was in the house; if he had run back off of the porch, he would have run into him with the gun.
The defendant made a statement to the jury, in substance as follows: That he was working at the time for his father-in-law, the deceased; and after they arrived at home he shot the deceased in defense of his own life; and that when he fired the deceased was pulling the hammer of the deceased's gun, bringing it up to his shoulder, and telling the defendant that he was going to kill the defendant.
Dewey F. Hall testified for the defendant: That he was sheriff of Johnson County; he was called to the home of Hilton Pope on the night of January 21, 1945, and found him killed, lying in the yard; found a gun and two shells around him; "this (indicating)" was the gun he found; that it was cocked, the hammer was down, it was ready to shoot. Mr. Pope's head was lying east, his feet west; his head was not toward the house, but, in the language of the witness, "kindly by the house, like the house was here (indicating), he was kindly laying sideways as I remember it." The witness was familiar with the pictures (indicating); he had the lights of his car on and it was night when he was there; the feet of the deceased were toward the road, the gun was lying just beyond his *Page 20 
head, about two feet, the barrel pointed toward the house and the butt lying toward his head. The witness could not say that he saw any print in the sand indicating that the deceased had the gun when he fell; and could not say that he saw any tracks indicating that somebody laid the gun there and walked away. The witness said: "That (indicating) is the picture showing the handkerchief on the stick;" that he "figured" Mr. Pope was lying a little farther from the house than "that (indicates);" but could not say positively about that, it being night and he "could not tell exactly." When the officer testifying first went there, the gun was plain to be seen, certainly anybody could have seen it if they could have seen Mr. Pope. The witness arrested the defendant, but did not remember if he said anything about the gun being there. The defendant said that he did it in self-defense, and told the witness that Mr. Pope was trying to shoot him with a gun. The officer saw no shot marks on the stock of the gun or barrel. "This picture (indicating) was taken from the front of the house, and Buttersworth was standing where the dog is sitting on the porch, and if Buttersworth had shot from there, if Mr. Pope was lying where the handkerchief is, he would have had to shoot him around the corner, but that wasn't where Mr. Pope was lying." The witness said that it was night, but he thought that the man must have been a little farther this way (indicating); and that Mr. Pope was lying somewhere from the well back this way (indicating on the picture).
J. G. Foskey testified for the defendant: That he recalled the time when Mr. Pope was killed; he went up to the home of the deceased and noticed that he was dead; he found a single barrel shotgun lying near him; "that (indicating) looks like the gun." It was "laying," he believed, near the head of the deceased, cocked, and looked as if, when he fell, the gun fell with him, and "this part of the gun here (indicating on the gun) had made a dent in the ground, and the gun was laying in that dent, cocked, when I got there." The witness beat on the gun, dropped it on the floor, and it remained cocked. He did not hear the gun fired, and did not know how long Mr. Pope had been dead when he got there; Mr. Pope was lying 15 or 20 feet from the front porch; there was nothing above the ground between the place where Mr. Pope was lying and the front porch to obstruct the view between him and the *Page 21 
porch; a man standing on the porch could have easily seen Mr. Pope; a man standing in the corner of the porch could have seen the spot where Mr. Pope's body was found; the gun was not back of Mr. Pope's head, but out to the right.
Grady Thompson testified for the defendant: That, the best he could remember, Mrs. Pope told him that Mr. Pope started around the house with the gun, but she knew that there were no shells there.
One of the grounds of the amended motion was based on newly discovered evidence. Attached to the amendment was an affidavit by Mrs. Junior Souls, a daughter of the deceased, in which she stated: That, on the night her father was killed, her father, the defendant, and her husband came home together; her father went into the house and asked her mother for his hat; her father, her husband, and the defendant then started to go off in the truck; and she asked her husband not to go, her mother asked the deceased not to go, and the defendant's wife asked him not to go. They all got out of the truck, and her father went into the house and when he came out had his shotgun, and the defendant went into the house. Her father came around the house with his gun, and she being scared, both she and her husband, Junior Souls, ran. She heard the gun shoot; and knew that, at the time her father was shot, he had the shotgun in his hand with shells in it. She did not know what happened just prior to the shooting, except that she heard her father say, "Look out, Buttersworth, I am going to kill you," and then she heard the gun fire.
On the counter-showing, Mrs. Junior Souls testified: That she did not read the affidavit signed by her, but that it was read to her, and in a way she understood it; two or three lines of the affidavit were read to her, but the lawyer had two pages; and she still knows what was in the affidavit only from what was told her. She was told that the affidavit stated: "that she was there the night of the killing, that it was about 12 o'clock when they came in, and there was a fuss started, and in the wrangle Daddy got his gun and come out the back way around to the front, and Buttersworth was standing on the porch and Daddy was out in the yard and he shot him" — that is what he (the lawyer) said was in it. Her daddy did have his gun. She attended the trial in Wrightsville both days, and sat with her husband, Junior Souls, and with *Page 22 
Harvey Souls' wife. One of the attorneys for the defendant got her to sign the affidavit. She heard all of the witnesses testify, including her husband; she had told her husband before the trial what she knew. She and her husband were up the road about fifty feet away when the gun fired. There was nothing to keep the defendant from putting her up as a witness; she was "summonsed" as a witness for the defendant at the commitment trial, and was willing to testify; she thought that she was going on the stand as a witness; she was not "summonsed" as a witness for the second trial. Her husband, one of the attorneys for the defendant, and a Mr. Souls were in a room, and her husband came out and stated that one of the defendant's lawyers wanted her to come in; and she told her husband that, if they wanted the truth, she would not be told what to tell; that they knew what she would swear; they knew when they subpoenaed her that she saw her father in the yard with a gun. She expected to be used as a witness and testify at the first trial, and she attended the second trial; her mother did not put her up as a witness because she had been "summonsed" as a witness on the other side.
Also attached to the amended motion was an affidavit by Bud Hudson, as follows: That during 1944 he resided at Scott, Georgia, near the home of Hilton Pope; just before Christmas or in the Fall of 1944, he had a conversation with Hilton Pope, during which the name of the defendant was mentioned, and Hilton Pope said that "Elmo Buttersworth was at the time in Savannah, Georgia, but that he was going to get him back in order that he could get even with him and in order that he could get him out of the way."
There was also attached to the amended motion an affidavit by Lyman Curl, in which he stated; That he was present in Scott, Georgia, just a few days before the death of Hilton Pope, and that Pope purchased a half box of gun shells from a man by the name of Pryor, left, and carried them with him.
On the counter-showing, R. T. Pryor by affidavit deposed: That he lived at Scott, and that between the 2nd and 5th of January, 1945, he sold to a man whose name he did not know twenty gun shells of mixed varieties. The affiant had not lived there very long and was not very well acquainted with the people. He had been subpoenaed by the defendant to attend the trial in Johnson *Page 23 
superior court, and to swear that the man to whom he sold the shells was Hilton Pope, but, not knowing, he could not say that Pope was the man who bought the shells; and that he talked with the attorney for the defendant about the case, was sent to the jury room and remained there until the argument of the case began, and was then released.
1. It is a right of a defendant being tried for murder to have the jury kept together while hearing and considering his case, Berry v. State, 10 Ga. 511, but he may waive such right. Code, § 102-106; Sarah v. State,28 Ga. 576; 23 C. J. S., Criminal Law, 1014, 1064, §§ 1355, 1387. In the early case of Mitchell v. State, 41 Ga. 527, 535, this court said: "In the matter of the court asking the prisoner's counsel if they would consent to a separation in the presence of the jury, we can realize the injustice in the manner of the request, but considering the law as laid down by this court, 10 Georgia 511, we do not think, no matter how much we may feel disinclined to sanction the practice, that it is an error of law upon the part of the judge to make the inquiry, or if consented to and there is no charge of unjust interference with the jury, that the act constitutes a ground for a new trial." During the trial of the instant case but before it was submitted to the jury, and at a private conference between the trial judge, the solicitor-general, and all the attorneys for the defendant, it was agreed that the jury might be dispersed for the night under instructions of the court, which were given. The defendant, having made such an agreement through his counsel, will not be heard to complain for the first time after the verdict, and on his motion for new trial, that the consent for the jury to disperse was given because the judge, at such conference, stated, "If you are not willing for me to disperse the jury, I will complete the trial tonight." Carter v.State, 10 Ga. App. 851 (74 S.E. 440); Sullivan v.Padrosa, 122 Ga. 338 (3) (50 S.E. 142); O'Dell v. State,120 Ga. 152 (47 S.E. 577). Except for the consent by the defendant through his counsel, the jury could not have been legally dispersed, but the statement of the judge that he would *Page 24 
complete the case that night unless a dispersal was agreed upon did not amount to such duress as would relieve the defendant from the consent given. The record does not show that counsel gave any reason at the time why they did not wish to consent, or that the statement of the judge was considered in any way detrimental to the defendant's case. In view of the foregoing, it was not error to overrule this ground of the motion for new trial.
2. Error is assigned also upon the following instruction to the jury: "You take the law as given you in charge by the court, the evidence from the sworn facts in the case, and the defendant's statement, and from the law so given and the facts thus ascertained, you as honest, conscientious, fearless, and impartial jurors, ascertain the truth of this case and let your verdict honestly and courageously speak it." Technically, that portion of the charge was an inaccurate statement, but when considered in connection with the further and later statement of the court, "Now, gentlemen of the jury, you take this case and apply the rules of law to all of the facts and circumstances of this case, including the defendant's statement," we do not see how the jury could have been misled by the particular expression of which complaint is made. Standing alone, the except would be subject to the attack made, but when aided by the further charge becomes no longer amenable to criticism. A charge, torn to pieces and scattered in disjointed fragments, may seem objectionable, but when put together and considered as a whole may be perfectly sound. Brown v. Matthews, 79 Ga. 1 (4 S.E. 13). And seeJones v. McElroy, 134 Ga. 857 (68 S.E. 729, 137 Am. St. R. 276); Martin v. Hale, 136 Ga. 228 (71 S.E. 133); Fowler
v. State, 187 Ga. 409 (1 S.E.2d 18); Martin v. Dunbar,10 Ga. App. 287 (73 S.E. 596). In his assignment of error the accused contends that such a charge had the effect of submitting for the jury's consideration only the sworn facts, and excluded any consideration of the exhibits (the four pictures and two shotguns), and had the effect of withdrawing from the consideration of the jury the oral testimony of his witnesses, Dewey F. Hall and J. G. Foskey, concerning the pictures and the guns. We are wholly unable to find any logical inference that the charge complained of had such an effect, and it took the oral testimony of these witnesses to make the exhibits of any value to the jury *Page 25 
in their consideration of the case. A picture unexplained and a shotgun not connected by oral testimony with the homicide doubtless would be but little, if any, help to the jury in its determination of the issue involved. The only possible theory of the complaint by the accused as to the charge is, that the exhibits, some of which were explained and identified by his witnesses, were excluded by the language of the trial judge. There is nothing in the record to suggest that the pictures and guns introduced were not before the jury when it considered the case, and this court has the right to presume that they were. Whatever benefit, if any, the accused would have derived from the exhibits, he received by having his witnesses, Hall and Foskey, by the use of the pictures before the jury, explain the premises where the homicide occurred and the respective locations of the parties, and by having the witnesses identify the gun of the deceased and its location near his body when they arrived at the scene of the killing. This case is different on its facts from that of Sikes v. DeLoach, 166 Ga. 887 (144 S.E. 655), cited by counsel for the plaintiff in error, where the judge in his charge made a statement somewhat similar to the one in this case. In that case there was a claim for land, and on the trial certain documents were introduced which furnished material evidence on the controlling issues in the case; and nowhere in his charge did the court instruct the jury to consider the case from all the facts and circumstances, as was done in the present case. The instruction complained of was not erroneous for the reasons stated.
3. A motion for new trial based upon the ground of newly discovered evidence is addressed very largely to the sound discretion of the trial judge, and his action will not be controlled by this court unless it is abused. Code, § 70-204;Hall v. State, 141 Ga. 7 (80 S.E. 307). In passing on such a motion, there are a number of things which the judge may consider, among which are: (1) The degree of diligence used by the movant and his counsel to discover, before the trial, the alleged new evidence; (2) whether the evidence is solely for the purpose of impeachment; and (3) the probability that the alleged new evidence will produce a different verdict if the case is tried again. Burge v. State, 133 Ga. 431, 432
(66 S.E. 243). By the exercise of any degree of diligence the accused or his counsel should have discovered before his *Page 26 
trial the testimony of his sister-in-law, Mrs. Junior Souls. He knew that she was present at the time of the killing. She was subpoenaed as a witness for him at the commitment trial of his case. She was present in the courtroom during the trial, and sat with her husband, a half brother of the defendant, and evidently from his testimony, Junior Souls was very sympathetic with the accused. The testimony given by Mrs. Souls on the counter-showing strongly demonstrates the lack of any degree of diligence on the part of the defendant to have the benefit of her evidence on his trial if he in fact wanted it. The testimony of the new witness, Lyman Curl, to the effect that he was with the deceased at Scott, Georgia, just a few days prior to the homicide, when he purchased some shotgun shells from Mr. Pryor, would have but little if any probative value except for impeachment, and hence presents no reason requiring a new trial. In view of the overwhelming evidence given by the eyewitnesses in this case against the accused, we think that the trial judge could very properly have concluded that the uncommunicated threat testified to by the new witness, Bud Hudson, would not likely produce a different verdict, should a new trial be granted. It follows from what has been said that this court must hold that the trial judge did not abuse his discretion in refusing a new trial on this ground of the amended motion.
4. The evidence was amply sufficient to support the verdict, and no error appears upon the general grounds. The trial court did not err in denying the motion for new trial.
Judgment affirmed. All the Justices concur, except Head, J.,disqualified.