A97A2326. ADAMS v. THE STATE.
(499 SE2d 105)

RUFFIN, Judge.

William A. Adams was indicted for violating the Georgia Racketeer Influenced & Corrupt Organizations Act ("RICO"), OCGA § 16-14-1 et seq. The 130-page indictment alleges in two counts that Adams, a timber broker, along with 27 other individuals and logging companies named as co-defendants, committed numerous offenses of theft by taking against Keadle Lumber Enterprises, Inc. ("Keadle").

See OCGA § 16-8-2. The indictment further alleges that Adams and the other defendants filed fraudulent timber deeds and uttered forged documents in an effort to cover up the ongoing criminal enterprise. See OCGA § 16-10-20. The indictment asserts that the defendants committed a total of 106 predicate acts of racketeering activity, of which 24 involved Adams. See OCGA § 16-14-3 (8) and (9). Following the trial court's severance of the defendants for trial, Adams was tried jointly with co-defendant J. M. Raines. Upon finding that Adams committed all 24 predicate acts, a jury returned a verdict of guilty on both counts. Adams appeals, and for reasons which follow, we affirm in part and reverse in part.

1. Adams asserts that the trial court erred in denying his special demurrer to 14 of the predicate acts of racketeering activity alleging theft by taking because the indictment did not set forth with specificity the manner in which he committed the offenses. We disagree.

The indictment generally describes the alleged criminal activity as follows: "As part of the criminal enterprise and in order to facilitate and secrete the theft of merchantable timber owned by [Keadle] and other property owners [the defendants] committed the following acts in furtherance of their criminal activity. Inflated or deflated the value of merchantable timber and timber cuts thereby defrauding the timber owner or the mill which purchased the timber; Forged contracts which were procured for the cutting of timber not owned by the defendants; Sold timber contracts to [Keadle] on land that does not exist; Sold timber contracts to [Keadle] for timber they did not own; Stole timber from [Keadle] and sold it to [Keadle] and in other markets; Inflated the acreage of timber tracts, purchased by [Keadle] through [the defendants] in order to inflate the purchase price paid by [Keadle]; Inflated the cruise value on timber contracts sold to [Keadle]; through [the defendants] to inflate the purchase price paid by [Keadle]; and Miscredited timber which was delivered to [Keadle] for the purpose of covering up previous thefts under contracts. The success of the criminal enterprises depended upon the cooperation of the defendants to move the timber product through their various companies until [its] origin or final destination was hidden from [Keadle] and/or the other timber property owners. In every count of this indictment, including all predicate acts, the offenses were unknown to the state until and after October 23, 1989." (Paragraph indentions omitted.) The indictment names Adams as part of the enterprise in that he was "associated in fact" with twelve other indicted individuals and five logging companies named in the indictment.

Count 1 of the indictment alleges that Adams participated in this pattern of racketeering activity between January 1, 1983 and December 31, 1990. Adams' participation is described in detail in

each of the 14 paragraphs alleging the particular predicate acts. For example, the paragraph concerning Adams' involvement in predicate act number one provides: "On August 11, 1986, [Adams] and Joseph R. Garrard, in Upson County, Georgia, did then and there unlawfully take property of [Keadle], having a value in excess of $500.00 to-wit: money represented by [Keadle] check #936, made payable to [Adams] dated August 11, 1986, drawn on the account of [Keadle] at the West Central Georgia Bank of Thomaston, Georgia, with the intention of depriving said owners of said property, contrary to the laws of said state, the good order, peace, and dignity thereof." The other 13 predicate acts involving theft by taking raised by Adams in this enumeration of error are described with equal specificity in the indictment.

We reviewed the sufficiency of this indictment on these same grounds in the appeal of co-defendant Jeffery Grant. See *Grant v. State*, 227 Ga. App. 88 (488 SE2d 79) (1997). In *Grant*, we concluded that the indictment was "in no way defective for being insufficient to support a prosecution and conviction. The requisite predicate acts and enterprises comprising the charges against [the defendants] are precisely described and named in each instance. No greater detail was required to allege the RICO offense under Georgia law." Id. at 90-91.

The descriptions of the predicate acts at issue here are similarly sufficient. The transactions are identified by the numbered checks or descriptions of specific acreage at issue. The indictment names the people involved in the transactions, the owners of the property which was allegedly taken and describes the place where the transactions occurred. Although the exact amount allegedly taken is not stated, the checks are specifically identified. When the indictment is read as a whole, it sufficiently described the offenses to permit Adams to mount a defense to them as racketeering acts and to allow him to plead the prosecution as a jeopardy bar to future prosecution of the same acts. Id. at 91-92. Accordingly, we find no error.

2. Adams asserts that the trial court erred in failing to grant his demurrer to the other ten predicate acts of racketeering activity because those acts were part of the 14 theft by taking transactions discussed in Division 1. The ten predicate acts which are at issue here involve the filing of false deeds in the land records of various superior courts. The State contends that these false deeds were filed in "an attempt to conceal and legitimize the [alleged thefts]." Adams asserts that the deed filings were part of the theft transactions and therefore cannot form the basis of separate predicate acts.

In *Raines v. State*, 219 Ga. App. 893 (467 SE2d 217) (1996), we addressed the same assertion raised by Adams in this enumeration of error. Raines, a co-defendant of Adams, was charged in the indictment with committing only two predicate acts: (1) theft by taking

under OCGA § 16-8-2 by selling a parcel of timber land for a price greatly in excess of its true value by means of false timbercruising reports,[1] and (2) filing a fraudulent deed showing the false cruise in the superior court land records, a violation of OCGA § 16-10-20. We concluded that "[t]he sale of timber from a single parcel of real property, by means of a single deed, in one isolated transaction, cannot be broken down into two predicate acts by separately charging the sale and the filing of the deed." *Raines*, supra at 894. Because Raines was only charged with two predicate acts, the minimum required for a RICO offense, and both acts constituted but one isolated transaction, we reversed his conviction. See id.; OCGA § 16-14-3 (8) (defining "pattern of racketeering activity" as engaging in *at least two* incidents of racketeering activity described in the statute).

In this case, we discern no significant distinction between the ten alleged predicate acts concerning the filing of false deeds and the one alleged in *Raines*. As stated in *Raines*, the deed filings were part of the theft transactions alleged as separate predicate acts. Accordingly, the trial court should have granted Adams' demurrer to the ten predicate acts alleging the filing of false deeds. *Raines*, supra.

However, this ruling does not require a complete reversal as it did in *Raines*. Raines' conviction was reversed because the State only alleged the minimum of two predicate offenses and we found that one of the acts should have been stricken from the indictment. See id. Here, upon striking these ten predicate offenses from the indictment, there will remain fourteen alleged theft offenses that the State can prove to establish a pattern of racketeering activity, any two of which would be sufficient to sustain a conviction under each count. See id.; OCGA § 16-14-3 (8).

3. Adams asserts that the trial court erred in overruling his demurrer to the indictment because 16 of the predicate acts "were not, as shown on the face of the indictment[,] committed within the statute of limitation." The indictment alleges, however, that Keadle did not discover the timber inventory losses until October 23, 1989, and that the offenses were unknown to the State until that time. The statute of limitation for RICO criminal prosecutions is five years. OCGA § 16-14-8. Under OCGA § 17-3-2 (2), the period of limitations is tolled during any period in which "[t]he person committing the crime is unknown or the crime is unknown[.]" Because the indictment in this case was returned on July 31, 1992, which was within five years of the time when the victim and the State first learned of the offenses, the trial court did not err in overruling Adams' demur-

---

[1] A "cruise" is described in the transcript as an estimated value of timber on a tract based on the amount, size, grade and accessibility of the timber.

rer on the grounds asserted. See id.; *State v. Brannon*, 154 Ga. App. 285 (2) (267 SE2d 888) (1980).

4. Adams asserts that his due process rights were violated because the State moved for a severance without notice to him and the trial court granted the motion without a hearing. Pretermitting consideration of whether the record supports Adams' assertion, we find that he has failed to show any harm resulting from the alleged error.

The decision of whether defendants, who are charged with noncapital felonies, should be "tried jointly or separately [is] in the discretion of the trial court." OCGA § 17-8-4. We note that OCGA § 17-8-4 does not provide a statutory procedure for a trial court to follow in deciding whether to join or sever defendants. See *Broomfield v. State*, 264 Ga. 145, 147 (2) (442 SE2d 242) (1994). Nevertheless, it is clear that to establish an abuse of discretion, a defendant must clearly show the manner in which he was prejudiced by the trial court's decision. *Depree v. State*, 246 Ga. 240, 241 (1) (271 SE2d 155) (1980); *Jones v. State*, 135 Ga. App. 893 (2) (219 SE2d 585) (1975).

In this case, Adams merely asserts, without any citation to the record, that "by virtue of the unlawful severance, the State was able to introduce into [his] trial, evidence that was illegally obtained by the State, and to which Appellant did not have opportunity to object." This does not constitute a clear showing of prejudice and we therefore find no abuse of discretion. See *Depree*, supra; see also Court of Appeals Rule 27 (c) (3) (i).

5. Adams asserts that the trial court erred in allowing the introduction of opinion testimony from two of the State's witnesses. We agree.

The first witness was Roy Olinger, an agent for the Georgia Bureau of Investigation who investigated the alleged thefts from Keadle. After Olinger explained the methods he used in investigating the thefts and the general schemes in which the thefts were committed by use of fraudulent contracts, the prosecuting attorney asked Olinger: "Now, I'm going to get into some general statements before we get back to some specifics. In relationship to this indictment, did you find any particular tracts of timber sold to [Keadle] by W. A. Adams? A. Yes, I did. Q. And in your investigation of those timber tracts, did any of those timber tracts fit the schemes — A. Yes, they did." In the 15 pages of testimony that followed, over Adams' objections, the State elicited conclusory statements from Olinger concerning Adams' participation in the thefts and the composition of the enterprise. For example, the State's attorney asked: "In relationship to . . . Mr. Adams, did you find that these fraudulent contracts that you have just described were also recorded at times? A. Yes. Q. Now, I'm going to go through some of the names of the other Co-

Defendants in this case. You've already described Mr. Joseph R. Garrard. And was he directly or indirectly involved with Mr. Adams . . . in the sale of fraudulent contracts to Keadle pursuant to your investigation? A. He was directly involved. . . . Q. In relationship to Mr. Joseph R. Garrard, did you ever find Mr. Garrard involved as you've described in this — the various schemes of thefts involving timber contracts in the contracts involving Mr. Adams? A. Yes, I did. Q. Did money flow back and forth between Mr. Adams and Mr. Garrard in relationship to the contracts that you've previously described? A. Yes, it did. Q. Now, what about the timber brokers or pin hookers, Mr. Grant, Mr. William Adams, Mr. Kenneth A. Fletcher, Mr. John M. Raines. What was their position in this criminal enterprise? A. Contracts. Q. They supplied the fraudulent contracts? A. Correct. Contracts and money." The State similarly elicited conclusory testimony concerning other defendants' participation in predicate acts and the enterprise.

Comparable testimony was presented by another State witness, William Yeomans. Yeomans was a private investigator retained by Keadle to investigate the thefts. Upon explaining his methods of investigating the thefts and his past experience in investigating such matters, the trial court qualified him as an expert of the "methodology of investigation of the timber industry of timber thefts." During the testimony that followed, Yeomans described how some of the thefts were committed by selling timber deeds to nonexistent tracts of land to Keadle. The State's attorney then asked Yeomans: "Now, did you ever uncover situations, pursuant to your investigation with [Keadle] of any of these nonexistent tracts in relationship to Mr. Adams?" Yeomans responded "Yes, we did." Later in Yeomans' testimony he described how the defendants committed "direct theft of timber" by stealing Keadle's timber and selling it to other timber companies. Yeomans summarily and unequivocally stated that he "[a]bsolutely" discovered such thefts, and that "[s]ometimes they would deliver Keadle's own wood back to Keadle and sell it as though they owned it personally." Finally, the State's attorney established that in October 1989, Adams bought back timber deeds he had previously sold to Keadle in an effort to conceal his participation in the enterprise. The State's attorney then asked Yeomans: "And did you look into and investigate the contracts that he repurchased? A. Yes, we did. Q. And did those contracts fit within the description as you described them to the jury as the method of criminology perpetrated within the timber industry? A. Yes. Q. Now, based on your investigation, Mr. Yeomans, when did this criminal enterprise end — in this conspiracy — criminal conspiracy? A. We found activity ongoing during the term of the investigation. . . ."

The State presented all of the foregoing testimony prior to intro-

ducing any primary evidence that Adams committed the alleged predicate acts, including evidence that he did not own the timber, that he executed the allegedly fraudulent timber contracts and that he received payment from Keadle under the contracts.

The testimony should have been excluded; it constituted nothing more than conclusions, and as a general rule " '[a]nswers constituting mere conclusions, surmise or conjecture [should be] excluded from evidence. (Cit.)' [Cit.]" *Carroll v. State*, 185 Ga. App. 857, 858 (1) (366 SE2d 232) (1988) (testimony that defendant stole checks was mere conclusion that should have been excluded). "Because the jury is the trier of fact, witnesses are generally not allowed to express their opinion as to ultimate issues involved in the case, as this is the province of the jury. We have allowed an exception to this general rule for opinions or conclusions, even as to ultimate issues, where 'the conclusion of the expert is one which jurors would not ordinarily be able to draw for themselves; i.e., the conclusion is beyond the ken of the average layman.' [Cit.]" *Maxwell v. State*, 262 Ga. 73, 76-77 (5) (414 SE2d 470) (1992). "It is only where: 'the nature of the question is such that the factors leading to a conclusion are not known to the common or average man, but are among those things shrouded in the mystery of professional skill or knowledge, . . .' [cit.], that the opinion or conclusion of an expert should be deferred to as to an ultimate issue." Id. at 77.

In this case, the factors which led the witnesses to the conclusions that Adams, in association with others, stole money from Keadle, were well within the knowledge and understanding of the jury. It is true that there were some matters that may have been proper for expert testimony, such as explanations of terminology unique to the timber industry and complex questions concerning title to land. It was not necessary, however, for these witnesses to conclusively testify that Adams was part of an enterprise to commit theft from Keadle by selling Keadle timber Adams did not own. The jurors were capable, upon proper instruction from the trial court, of concluding that if Adams took money from Keadle under these circumstances, then he committed the thefts. Similarly, the jurors could conclude that if he acted in association with others, he was part of the enterprise. Here, the State merely employed these two witnesses "to argue and bolster its theory of a case where neither the ultimate issue of fact nor the method of proving that fact [were] beyond the average juror's comprehension. . . ." *Williams v. State*, 254 Ga. 508, 511 (2) (330 SE2d 353) (1985).

In addition to finding that the statements constituted improper opinion testimony, we conclude that any probative value of the testimony was substantially outweighed by the danger of unfair prejudice. See *Simms v. State*, 223 Ga. App. 330 (2) (477 SE2d 628)

(1996); *United States v. Schmidt,* 711 F2d 595, 598-599 (5th Cir. 1983). In some instances, the conclusory statements of guilt were made by a witness who was qualified before the jury as an expert. In light of the unequivocal nature of the witnesses' conclusions, there was a real danger that the jurors perceived the expert's testimony as infallible. Moreover, however, the conclusions of guilt were presented prior to the introduction of *any* primary evidence supporting them. And, although "[t]he trial court may govern the order of proof, [it may not do so] if the weight of proof is prejudicially affected." *Haley v. Oaks Apts., Ltd.,* 173 Ga. App. 44, 48 (10) (325 SE2d 602) (1984) (physical precedent only). Here, it is highly probable that the jurors were persuaded by this testimony that Adams was guilty, without any admissible evidence of guilt before them. See *Carroll,* supra. Accordingly, notwithstanding the evidence subsequently presented by the State, we find the admission of this testimony harmful. See id. Adams is entitled to a new trial, and the judgment of conviction is therefore reversed.

6. We now address Adams' other assertions of error which may be relevant to the retrial of this case. We find no merit in Adams' assertion that the trial court erred in allowing into evidence declarations of alleged co-conspirators prior to establishing the existence of a conspiracy. This decision falls within the trial court's discretion concerning the order of proof at trial. *Bruce v. State,* 263 Ga. 273 (4) (430 SE2d 745) (1993).

7. Adams asserts that the trial court erred in rejecting all of his requested charges and in failing to file his requested charges with the trial court clerk. We find no reversible error.

OCGA § 5-5-24 (b), which governs requests to charge, provides that "[i]n all cases, at the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may present to the court written requests that it instruct the jury on the law as set forth therein. Copies of requests shall be given to opposing counsel for their consideration prior to the charge of the court. The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury but shall instruct the jury after the arguments are completed. The trial judge shall file with the clerk all requests submitted to him, whether given in charge or not." OCGA § 5-5-24 (b) "does not require a judge to accede to a party's requested charges. . . ." *Wozniuk v. Kitchin,* 229 Ga. App. 359, 361 (3) (494 SE2d 247) (1997). And, even if the trial judge erred in failing to file Adams' requested charges with the clerk, Adams has not shown that he was harmed by such error. See *Nelson v. Seaboard Coast Line R. Co.,* 125 Ga. App. 764 (1) (188 SE2d 887) (1972). Indeed, though he was not required to do so, Adams states that he filed the requests with the clerk. Consequently, there can be no

harm, hence no error by the trial judge in failing to file the charges.

8. Adams asserts that the trial court erred in refusing to admit into evidence a deposition transcript from a civil case in which co-defendant Joe Garrard provided exculpatory testimony. Adams contends that Garrard was unavailable to testify at trial and that the trial court was therefore required to admit the deposition transcript under OCGA § 24-3-10. We disagree.

OCGA § 24-3-10 provides that "[t]he testimony of a witness . . . inaccessible for any cause which was given under oath on a former trial upon substantially the same issue and between substantially the same parties may be proved by anyone who heard it and who professes to remember the substance of the entire testimony as to the particular matter about which he testifies." Pretermitting whether Garrard was inaccessible, whether the former civil trial involved substantially the same issue and whether OCGA § 24-3-10 contemplates the introduction of deposition testimony, Adams has not established that the State was a party in the former trial or that the State had an opportunity to cross-examine Garrard at the deposition. See *Green v. State*, 207 Ga. App. 800, 801 (429 SE2d 169) (1993). Accordingly, the trial court did not abuse its discretion in excluding the prior deposition testimony. Id.

9. Adams asserts that the trial court erred in placing him into custody during a lunch recess. The transcript shows that prior to the recess, the trial judge instructed Adams that a bailiff would accompany him to lunch. Although Adams objected to the court's decision, there is no evidence that any of the jurors observed him with the bailiff, and Adams did not raise such a contention following the recess. Adams has cited no authority showing error, and in the absence of any evidence that he was prejudiced by the court's directive, we find no error. See *Hill v. State*, 193 Ga. App. 401 (8) (387 SE2d 910) (1989).

10. Adams asserts that it was error "for the prosecutor to ask [a] witness to point out and identify Jeff Grant, a bystander in the courtroom, as a co-conspirator in order to imply criminal conduct and association with [Adams] in that [Adams] was not allowed to cross-examine said Jeff Grant." In support of his assertion, Adams cites to *Bruton v. United States*, 391 U. S. 123 (88 SC 1620, 20 LE2d 476) (1968). We find no error.

The transcript shows that when Adams objected to testimony concerning Grant elicited during the State's examination of a witness, the trial court asked if Grant was available to testify. The State's attorney stated that he was and noted that "he's sitting right back there in the corner."

Adams has not shown why the prosecutor's statement requires reversal. "*Bruton* applies to situations where there is the 'admission

in a joint trial of a non-testifying co-defendant's statement incriminating the defendant (thereby) violating the defendant's right to confront and cross-examine the co-defendant. There is no *Bruton* violation unless the non-testifying co-defendant's statement, standing alone, clearly implicates the defendant. (Cit.)' [Cit.]" (Emphasis omitted.) *Slaughter v. State*, 227 Ga. App. 739, 742 (3) (c) (490 SE2d 399) (1997). We do not find that simply pointing to a co-defendant in the courtroom under these circumstances is controlled by *Bruton*, and therefore find no error in the trial court's failure to grant a mistrial on this ground.

11. Although Adams asserts that the trial court erred in closing the courtroom to the public during jury selection, he cites no evidence in support of this assertion and thus presents nothing for our review. See Court of Appeals Rule 27 (c) (3) (i).

*Judgment on defendant's demurrer to the indictment affirmed in part and reversed in part. Judgment of conviction reversed and case remanded for new trial. Birdsong, P. J., and Eldridge, J., concur.*

DECIDED MARCH 17, 1998.

*Richard T. Bridges*, for appellant.

*Thurbert E. Baker, Attorney General, Michael E. Hobbs, Counsel to the Attorney General, Joseph L. Chambers, Patrick D. Deering*, for appellee.