A05A2098. LINDO v. THE STATE.
(628 SE2d 665)

BARNES, Judge.

Fernando Lindo appeals his conviction for the aggravated battery[1] of his five-week-old son by shaking him and causing brain damage. He contends the trial court erred by refusing to accept his

[1] Although Lindo was also convicted of cruelty to children in the first degree, that conviction was vacated because the trial court found that this offense merged as a matter of fact into the conviction for aggravated battery.

waiver of his right to a jury trial, by giving an erroneous jury charge on the intent required to commit the crime, and by denying his motion for a directed verdict of acquittal. Lindo also contends his trial counsel was ineffective. After his motion for new trial was denied, Lindo filed this appeal. Finding no reversible error, we affirm.

1. Lindo first contends that the trial court erred by refusing to exercise its discretion and consider his request to waive his right to trial by jury. The State first argues that by not stating an exception to this ruling, making an objection, or otherwise preserving the issue after the trial court denied his request for a bench trial, Lindo has somehow failed to preserve this issue for appeal. This argument is without merit. The State of Georgia

> has long since abolished the common law's requirement of a "bill of exceptions." Once the trial court has addressed a party's motion or objection and has issued a ruling, the party adversely affected need not then further object or "except" to the trial court's ruling in order to preserve the issue for appeal.

(Citation omitted.) *Davie v. State*, 265 Ga. 800, 802 (2) (463 SE2d 112) (1995). See OCGA § 5-6-49 (a).

Contrary to Lindo's argument, even though defendants may waive or renounce what the law has established in their favor, they have no right to demand that they be tried by the court without a jury. *Palmer v. State*, 195 Ga. 661, 669 (1) (25 SE2d 295) (1943).[2] Therefore, the trial court did not err by denying Lindo's request for a bench trial.

Nevertheless, Lindo further argues that by stating "[u]nless and until the Supreme Court makes some determination about this Court's discretion in granting or not granting nonjury trials, I don't intend to grant any," the trial court adopted a mechanical policy never to grant bench trials, and thus has abdicated its judicial responsibility. Lindo supports this argument by citing to cases in which we reversed trial courts for adopting mechanical formulas or policies in other areas.

A significant difference exists between those cases and this case. Here, the trial court refused to grant Lindo's request for a nonjury trial, but the legislature has not created a procedure in which defendants have the right to request nonjury trials or created a procedure in which the trial court in the exercise of its discretion must

---

[2] There is no federal constitutional right to a trial by judge alone and no such right existed at common law. *Singer v. United States*, 380 U. S. 24, 26-27 (85 SC 783, 13 LE2d 630) (1965).

consider whether to grant such requests. In the cases on which Lindo relies, however, the legislature created the procedures in which the trial courts were required to exercise their discretion.

We have held that because broad sentencing discretion is vested in trial courts, they have the duty to exercise that discretion in all aspects of sentencing. Thus a trial court's use of a mechanical sentencing policy about any part of a sentence is a refusal to exercise its discretion and an abdication of its judicial responsibility. *Cottingham v. State*, 206 Ga. App. 197, 199 (3) (424 SE2d 794) (1992). In other cases, we held that, because the legislature specifically provided for first offender treatment as an option in felony cases in the trial court's discretion, adhering to a mechanical sentencing formula that excluded first offender treatment was a refusal to exercise the discretion vested by the legislature in the court. See, e.g., *Stovall v. State*, 251 Ga. App. 7, 10 (2) (553 SE2d 297) (2001).

In the same manner we held that refusing to consider a plea of nolo contendere under the privilege granted defendants by the legislature was also an abdication of the court's judicial responsibility. *Vanegas v. State*, 249 Ga. App. 76, 77 (1) (547 SE2d 718) (2001). We have also held that a trial court's refusal even to consider granting bail constituted a similar abdication. *Knapp v. State*, 223 Ga. App. 267, 268 (477 SE2d 621) (1996).

The legislature, however, has not vested the trial court with the authority to grant requests for nonjury trials or created a procedure during which the courts must consider such requests. Therefore, nothing prohibits trial courts from adopting a policy that ensures that defendants will receive the jury trial to which they are constitutionally entitled. "The right to trial by jury shall remain inviolate. . . ." Ga. Const. of 1983, Art. I, Sec. I, Par. XI.

Although a better practice might be for trial courts to consider each request for a bench trial on its merits, we find a significant difference exists between refusing to exercise discretion inherent in the trial court, and refusing to exercise discretion vested by the legislature. In these circumstances, the trial court did not err by denying Lindo's request for a nonjury trial.

2. Lindo further contends the trial court improperly charged the jury on the intent required to commit aggravated battery. Because Lindo neither requested the charge he contends should have been given, nor objected to the charge as given, this issue is not properly before us. Thus, we will consider this enumeration of error in connection with Lindo's assertion that his defense counsel was ineffective for not preserving these charging errors for appellate review.

3. Lindo also contends that the trial court erred by denying his motion for a directed verdict of acquittal because the State's evidence was entirely circumstantial, the State did not prove that he intended

to cause bodily harm to his son, and the evidence did not show that the child's brain was rendered useless, as was alleged in the indictment because the evidence showed that he could perform some functions even though the now two-year-old child could not crawl or walk.

Lindo's motion for a directed verdict of acquittal, however, was based solely[3] on the State's failure to prove the required intent. Therefore, whether the State proved that the child's brain was rendered useless is not properly before us because it was not presented to the trial court and is being raised for the first time on appeal. *Cooper v. State*, 173 Ga. App. 254, 256 (1) (325 SE2d 877) (1985). In any event, this argument is without merit because "[w]hen the evidence shows that [battered victims have] suffered a severe injury to their brain, resulting in the loss of normal brain functioning, they are said to have been 'deprived of their brain,' thus suffering an aggravated battery." *Miller v. State*, 275 Ga. 730, 732 (1) (571 SE2d 788) (2002). See also *Jackson v. State*, 153 Ga. App. 584, 585 (1) (266 SE2d 273) (1980) (victim deprived of hearing where ear is capable of hearing no more than a "slight beep"). A motion for a directed verdict of acquittal only should be granted

> when there is no conflict in the evidence and the evidence with all reasonable deductions and inferences therefrom demands a verdict of acquittal as a matter of law. OCGA § 17-9-1 (a). The test established in *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979), is the appropriate one to use when the sufficiency of the evidence is challenged, whether the challenge is from the denial of a directed verdict or the denial of a motion for new trial based upon alleged insufficiency of the evidence. [Cit.]

*Coley v. State*, 272 Ga. App. 446, 450 (5) (612 SE2d 608) (2005). When employing this test, a reviewing court may consider all the evidence in the case, *Bethay v. State*, 235 Ga. 371, 375 (1) (219 SE2d 743) (1975), and must view the evidence in the light most favorable to the verdict. *Humphrey v. State*, 252 Ga. 525, 527 (1) (314 SE2d 436) (1984).

Viewed most favorably in support of the verdict, the evidence shows that Victoria Bassett, Lindo's girlfriend and the mother of the victim, left the then five-week-old baby at home with Lindo while she worked. No one else was with them. The mother testified that her son

---

[3] The defense counsel stated, "Your honor, my motion basically is to ask for a directed verdict as to both counts solely on this issue. In both the aggravated battery and the cruelty to the child it is very clear that the State has to prove malicious intent beyond a reasonable doubt."

appeared normal before she went to work, but when she returned he appeared to have a cold, he had a little bit of blood in his eyes, he sounded hoarse when he cried, and his cry was "hoarse and vague." When she asked Lindo what was wrong with the child, he agreed he probably had a cold. Later, when she attempted to give the baby Tylenol, he vomited.

The mother, baby, and Lindo were in the process of moving to Columbus, Georgia, and when they arrived there, the baby seemed sick and "kind of lifeless." The baby's maternal grandmother saw that the baby had bloodshot eyes, was "twitching," and was making a "little moaning noise," and decided to take him to the hospital. At first the doctors thought the baby might have meningitis, but after a CAT scan, they concluded that he had shaken baby syndrome. Consequently, they flew the baby by helicopter to Children's Healthcare of Atlanta.

After the mother returned to Columbus from Atlanta, Lindo told her that while he was carrying the baby, he tripped and fell, and the baby bumped his head on a chest. Earlier, Lindo kept crying and saying that he "hoped he didn't hurt him," and that he "hoped he didn't play too rough" with him.

The mother testified at the time of trial that, even though her son was 22 months old he could not crawl, walk, or sit up, and while he could roll over, if he got mad or excited, he would tense up "like a log." She also testified that she did not shake the baby.

The prosecution introduced Lindo's statement to the police in which he related that he stumbled over some boots while carrying the child and that the child hit his head on a chest. Lindo said that the baby continued to cry and he walked him around, but the more he walked, the more the child cried. He said that he carried the baby over his arm and rocked him.

A physician, who is an expert in child abuse and the shaken baby syndrome, testified that he did not examine the child personally, but did review his medical record. He explained that the shaken baby syndrome is incurred when a baby is violently shaken to the extent that the child is injured, and the primary injury is to the brain. In 90 percent of shaken baby cases the baby suffers retinal hemorrhages, bleeding on the inside of the eye behind the eyeball, as well as subarachnoid hemorrhage or subdural hemorrhage. Primarily found in shaken baby syndrome cases, retinal hemorrhages are rarely seen in anything else in childhood. The doctor demonstrated to the jury the amount of force required to inflict an injury on an infant sufficient to cause the shaken baby syndrome. In the doctor's opinion, merely hitting the baby's head on an object while falling would not result in a shaken baby syndrome injury, nor would dropping the baby. The

baby's symptoms of the syndrome would be significant and immediate. In addition to the retinal hemorrhages, other symptoms would include a lack of response from the baby, throwing up, and limpness.

The prosecution also called the chief of pediatric neurology from Emory who examined the baby in the pediatric intensive care unit because he was admitted with head trauma and recurrent seizure activity. The doctor found that he "had acute subdural hematomas, bilateral intracerebral hemorrhages, and multiple strokes within both cerebral hemispheres." Even though trauma from other causes would also be consistent with these injuries, the doctor did not believe the injuries were consistent with an accident or unintentional act because the "child sustained multiple injuries within the brain, with multiple hemorrhages outside the brain, inside the brain and multiple strokes on both sides of the brain. I think that requires recurrent head acceleration/deceleration injury or impact injury."

Lindo testified in his own behalf that he has a bachelor's degree and is a few classes away from his master's degree. The injured child is one of his three children. On the day of the incident, he and the baby's mother were in the process of moving from Atlanta to their hometown of Columbus. He was taking care of the baby while the mother worked. The child seemed to be all right; after Lindo woke him in the morning, changed his diaper, and fed him a bottle, the baby went back to sleep. Later the baby woke up crying. Lindo picked him up and started to prepare another bottle. He had heated it and, while he walked from the kitchen to the living room, he started to put the top on the bottle. He was holding the baby in his left hand and the bottle in his right hand, when he tripped over some boots. He fell with the baby in his arms, and the baby's head and Lindo's arm struck a chest on the way down. Lindo got up immediately and "like flipped" the baby over to feel his head and see if he was bleeding, and there was nothing that he could see.

The baby cried for a while, and Lindo walked around with him trying to get him to calm down. Eventually, the baby went to sleep, and Lindo thought he was all right. He could see nothing wrong with him. There were no bruises or bumps and no bleeding. After the mother returned home later, they noticed the baby's eyes were a little bloodshot and he seemed to be getting a little sick, like he was catching a cold.

Lindo denied shaking the baby; the most he did was to rock him over his arm. Lindo demonstrated the fall to the jury and how he rocked the child. He was not mad at his son and did not intend to injure his son.

Lindo admitted on cross-examination that he did not tell the baby's mother about the fall even after they noticed the baby was not doing well. He did not tell anyone about the fall until after the baby was flown to Atlanta.

Although the prosecution relied on circumstantial evidence to establish Lindo's guilt,

> [w]hen the jury is authorized to find the circumstantial evidence was sufficient to exclude every reasonable hypothesis except the defendant's guilt, the verdict will not be disturbed unless the verdict cannot be supported as a matter of law. A conviction based upon circumstantial evidence is authorized only when the "proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis (but) that of the guilt of the accused." OCGA § 24-4-6. When it meets this test, circumstantial evidence is as probative as direct evidence, and whether this burden has been met is a question for the jury. Further, circumstantial evidence must only exclude every other reasonable hypothesis save the defendant's guilt[;] it need not exclude every possible inference or hypothesis.

(Citations and punctuation omitted.) *Hobbs v. State*, 272 Ga. App. 148, 150-151 (2) (611 SE2d 775) (2005). Questions about the reasonableness of hypotheses are generally to be decided by the jury. *Robbins v. State*, 269 Ga. 500, 501 (1) (499 SE2d 323) (1998). This is because

> [a]n appellate court has no yardstick by which to determine what in a given case is a reasonable hypothesis except to rely on the informed and weighed conclusions of twelve intelligent jurors. These jurors observed and heard the witnesses and are best qualified to judge the reasonableness of an hypothesis raised by evidence or its lack than is this court which is restricted to issues of law.

*Tenner v. State*, 165 Ga. App. 646, 647-648 (302 SE2d 405) (1983). Further,

> [e]ven when the defendant is the sole eyewitness, the defendant's explanation may be rejected by the jury where that explanation is inconsistent with other direct and circumstantial evidence. *Terry v. State*, 243 Ga. 11, 12-13 (1) (252 SE2d 429) (1979). In the case sub judice, the jury was authorized to believe the testimony of the doctors rather

than that of appellant regarding the nature of the injuries, and that testimony would support an inference of malice. Moreover, given that appellant admitted he was the only one present when the injuries occurred, the jury would have been authorized to infer as well that appellant caused the injuries.

*Morris v. State*, 202 Ga. App. 673, 674 (415 SE2d 485) (1992). In this case, contrary to Lindo's testimony, the State presented expert testimony that neither a fall nor an accident would have caused the injury suffered by the child.

Thus, considering the evidence discussed above, we conclude that the jury rationally could have found from the circumstantial evidence that every reasonable hypothesis was excluded except that Lindo maliciously shook the baby, causing the loss of brain function. Consequently, the transcript reveals ample evidence from which any rational trier of fact could have found beyond a reasonable doubt that Lindo was guilty of the aggravated battery. *Jackson v. Virginia*, supra, 443 U. S. 307.

Therefore, the trial court did not err by denying Lindo's motion for a directed verdict of acquittal.

4. Finally, Lindo contends the trial court erred by denying his motion for a new trial because his trial defense counsel was ineffective in several respects.

To prevail on a claim of ineffectiveness of counsel under our law,

a defendant must show that counsel rendered deficient performance and that actual prejudice resulted. Counsel are strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment, and counsel's performance is evaluated without reference to hindsight. A petitioner has suffered actual prejudice only where there is a reasonable probability (i.e., a probability sufficient to undermine confidence in the outcome) that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Ineffective assistance claims are mixed questions of law and fact. We accept the [trial] court's findings of fact unless clearly erroneous and independently apply the law to those facts.

(Citations and punctuation omitted.) *Head v. Hill*, 277 Ga. 255, 266 (VI) (587 SE2d 613) (2003). Lindo's "burden is to show only 'a reasonable probability' of a different outcome, not that a different

outcome would have been certain or even 'more likely than not.' [Cit.]" *Schofield v. Gulley*, 279 Ga. 413, 416 (I) (A) (614 SE2d 740) (2005).

(a) Lindo contends his counsel was ineffective because he failed to tell Lindo that the State had offered a plea bargain of five years to serve. Lindo contends that his trial defense counsel told him that the State made such an offer at the plea and arraignment hearing and that he would have accepted it if he had known of it, but he did not learn of it until the final plea hearing at which time the State's minimum offer had increased to 20 years with 15 to serve. Lindo testified at the motion for new trial hearing that the first offer was made in July 2002 and the last offer was made in December 2002.

No notation is in the prosecution's file about what plea offer was made, but the prosecutor testified that she did not recall making any offer of five years to serve, that she did not usually make offers at pretrial, that she recalled making an offer requiring fifteen years to serve, and that she recalled the defense counsel being upset with her about that offer. Additionally, she testified that she did not believe she would have made the offer Lindo claims because of the seriousness of the injuries and in fact she reindicted the case to increase the time Lindo would serve in prison. She would not have reindicted the case if she had made a five-year offer. As the record provides evidence from which the trial court could conclude that the prosecution did not make the offer and would not consent to a five-year deal, the court was authorized to find there was no reasonable probability of a different outcome of the trial based on this argument. *Schofield v. Gulley*, supra, 279 Ga. at 416.

(b) Lindo also argues that his defense counsel was ineffective because he failed to object when the pediatric neurologist testified "this was a case of non-accidental head injury." He relies upon *Mann v. State*, 252 Ga. App. 70, 72 (1) (555 SE2d 527) (2001), which held that

> a witness, even an expert, can never bolster the credibility of another witness as to whether the witness is telling the truth. Credibility of a witness is not beyond the ken of the jurors but, to the contrary, is a matter solely within the province of the jury.

(Citation and punctuation omitted.) Id. Mann's conviction was reversed because we could not "conclude that defense counsel's failure to properly object and have this testimony removed from the jury's consideration had no effect on the verdict." Id. at 74. Lindo's trial defense counsel testified that he did not object to this testimony because he planned to impeach the doctor in his cross-examination and he believed that impeachment was more effective than merely having an objection sustained. The failure to object in this instance

then was clearly part of counsel's trial strategy, and " '[s]ubstantial latitude' is given during judicial review of trial counsel's decisions regarding trial strategy." (Citations omitted.) *Rivers v. State*, 271 Ga. 115, 118 (2) (b) (516 SE2d 525) (1999).

Additionally, a more fundamental reason exists for not finding that the failure to object was ineffectiveness of counsel: The testimony was admissible. "Expert opinion testimony on issues to be decided by the jury, even the ultimate issue, is admissible where the conclusion of the expert is one which jurors would not ordinarily be able to draw for themselves; i.e., the conclusion is beyond the ken of the average layman. [Cits.]" *Smith v. State*, 247 Ga. 612, 619 (277 SE2d 678) (1981). Thus, expert testimony is admissible if

> the nature of the question is such that the factors leading to a conclusion are not known to the common or average man, but are among those things shrouded in the mystery of professional skill or knowledge, that the opinion or conclusion of an expert should be deferred to as to an ultimate issue.

(Citation and punctuation omitted.) *Adams v. State*, 231 Ga. App. 279, 285 (5) (499 SE2d 105) (1998). As the cause of the baby's injuries was based upon inferences drawn from medical evidence, they were beyond the ken of the average juror. *Allison v. State*, 256 Ga. 851, 852 (3) (353 SE2d 805) (1987). See also *Foster v. State*, 273 Ga. 34, 35 (2) (537 SE2d 659) (2000) (crime scene expert's testimony admissible on why a perpetrator might move or cover his victim's body); *Bethea v. State*, 251 Ga. 328, 331 (10) (304 SE2d 713) (1983) (medical circumstances of child's death beyond ken of the jury).

Accordingly, the failure to object to this testimony was not error.

(c) Lindo further argues that his counsel was ineffective because he failed to request a charge that, "under OCGA §§ 16-5-24 (a)[4] and 16-5-70 (b),[5] malice means the absence of justification or excuse and the presence of an intent to cause the harm produced or the wanton and wilful doing of an act with awareness of the likelihood that such harm may result." He relies upon *Lee v. State*, 255 Ga. App. 87 (564 SE2d 503) (2002) as authority for this proposition. *Lee*, however, does not hold that such a charge is required, and does not hold that the

---

[4] "A person commits the offense of aggravated battery when he or she maliciously causes bodily harm to another by depriving him or her of a member of his or her body, by rendering a member of his or her body useless, or by seriously disfiguring his or her body or a member thereof."

[5] "Any person commits the offense of cruelty to children in the first degree when such person maliciously causes a child under the age of 18 cruel or excessive physical or mental pain."

State must prove that a defendant had the specific intent to violate the Code section. It merely applied the definition quoted above in determining whether the evidence was sufficient to sustain the verdict.

Moreover, the appellate courts of this State have held repeatedly that the word "maliciously" is of such obvious significance and understanding that it requires no definition. *Jones v. State*, 263 Ga. 835, 838 (2), n. 3 (439 SE2d 645) (1994); *Grant v. State*, 257 Ga. App. 678, 680 (1) (a) (572 SE2d 38) (2002). Consequently, the failure to request such a charge did not constitute ineffective counsel. Decisions on requests to charge involve trial tactics to which we must afford substantial latitude, and "they provide no grounds for reversal unless such tactical decisions are so patently unreasonable that no competent attorney would have chosen them." (Citations omitted.) *Henderson v. State*, 252 Ga. App. 295, 299 (2) (b) (556 SE2d 204) (2001).

(d) Finally, Lindo asserts that his defense counsel was ineffective because he did not object when the trial court charged the jury that "[c]riminal intent does not mean an intention to violate the law or to violate a penal statute but means simply to intend to commit the act which is prohibited by a statute." Lindo contends that the charge given was deficient because it allowed the jury to return a guilty verdict on a lesser standard of proof than required by law. It is a fundamental rule in this State, however, that jury instructions must be considered as a whole in determining whether there was error in the charge.

In reviewing the charge given, we first note that the trial court charged on the presumption of innocence, that "[n]o person shall be convicted of any crime unless and until each element of the crime is proven beyond a reasonable doubt," and that the State had the burden of proof. The court also charged the jury that intent was an essential element of any crime which much be proven by the State beyond a reasonable doubt, and that

> [i]ntent may be shown in many ways provided you, the jury, believe that it existed from the proven facts before you. It may be inferred from the proven circumstances or by acts and conduct or it may be, in your discretion, inferred when it is the natural and necessary consequence of the act. Whether or not you draw such an inference is a matter solely within your discretion.

And, the court also charged that Lindo "will not be presumed to have acted with criminal intent, but you may find such intention or the absence of it upon a consideration of words, conduct, demeanor, motive and other circumstances connected with the act for which the

accused is being prosecuted." Then the court further instructed the jury that "[a] person commits the offense of aggravated battery when he maliciously causes bodily harm to another by rendering a member of his body useless."

In this context we find that the failure to object was not error. Under our law, the State is not required to prove that Lindo had the specific intent to maim the baby.

> In a prosecution for aggravated battery, the State must show that defendant "maliciously cause(d) bodily injury to another by depriving him of a member of his body, by rendering a member of his body useless, or by seriously disfiguring his body or a member thereof." OCGA § 16-5-24 (a).

*White v. State*, 210 Ga. App. 563, 564 (436 SE2d 584) (1993). Therefore, Lindo's counsel was not ineffective for not objecting to the charge given, and the trial court did not err by denying Lindo's motion for a new trial on these grounds.

*Judgment affirmed. Ruffin, C. J., and Johnson, P. J., concur.*

DECIDED MARCH 15, 2006.

*Charles H. Frier*, for appellant.
*Paul L. Howard, Jr., District Attorney, Anne E. Green, Assistant District Attorney*, for appellee.