308 Ga. 306
FINAL COPY

S20A0027.  WILSON v. THE STATE.

ELLINGTON, Justice.

Following a jury trial, Robert Wilson was convicted of the murder of his infant son, Trey.[1] He appeals, challenging only the sufficiency of the evidence. Specifically, Wilson contends that the evidence that he is the person who caused Trey's fatal injuries was entirely circumstantial and that the evidence presented at trial did not exclude his reasonable hypothesis that Lashawn Dugger, the victim's mother, fatally injured the victim. For the reasons set forth below, we disagree and affirm Wilson's conviction.

---

[1] The crimes occurred on February 23, 2007. A Telfair County grand jury returned an indictment on March 19, 2007, charging Wilson with felony murder (Count 1) and cruelty to children in the first degree (Count 2). Following a jury trial ending on March 26, 2008, Wilson was found guilty on both counts, and the trial court sentenced him to life imprisonment for murder. Count 2 merged with Count 1. Wilson filed a motion for a new trial on April 10, 2008. After a December 4, 2018 hearing, more than ten years later, the court denied the motion for a new trial on March 15, 2019. Wilson filed a timely notice of appeal, and his appeal was docketed in this Court for the term beginning in December 2019 and submitted for decision on the briefs.

Viewed in the light most favorable to the verdict,[2] the evidence showed the following. On February 23, 2007, between 11:00 and 11:30 a.m., Dugger and Wilson took their six-month-old son, Trey, to visit Dugger's sister, Sacha Bennett, while she was on a break at her job. On the way home, Dugger and Wilson picked up lunch and returned home. Dugger testified that, after they ate lunch, Trey vomited, and she changed Trey's clothes in the living room, cleaned him up with a wet wipe, gave him a bottle of Pedialyte, and laid him on the couch. Dugger was due at her job at the Telfair State Prison at 1:45 p.m. that day for a briefing before the 2:00 to 10:00 p.m. shift that she worked. She called a restaurant and placed an order for a meal to take to work, put on her uniform, and left at approximately 1:00 p.m. so she would have time to pick up her food order, drive to the prison, and process through the security gates to reach the briefing room. Dugger's supervisor testified that Dugger was at the 1:45 p.m. briefing that day.

---

[2] See *Jackson v. Virginia*, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979).

After Dugger left for work, Vincent Clark, a friend of Wilson's, stopped by to visit Wilson. Clark testified that it was "probably about" or "close to" 2:00 p.m. when he arrived and that Trey was lying asleep on the sofa and slept the whole time he was there. Clark testified that he stayed for "30 minutes to an hour or something like that," watching television and talking with Wilson, and left "about 2:45 [p.m.] or something like that," after his mother telephoned him, although he could not remember the exact time. On cross-examination, Clark testified that he was "sure" that he did not leave at 2:00 p.m. that day. As Clark was leaving, Trey spit up a little bit.

Shortly before 3:00 p.m., Wilson went across the street to ask a neighbor for a ride to the hospital, stating that his son was sick. The first neighbor he asked was not available, but another neighbor, Shawn Brown, who was already in his car getting ready to run an errand, agreed to take Wilson and Trey to the hospital. Wilson went back to his home to get Trey, and they set out for the hospital. Wilson testified at trial that Trey had a heartbeat and was breathing when they got into Brown's car. During the drive, which took about five to

six minutes, Wilson told Brown to hurry because he feared that Trey had stopped breathing. Wilson called Bennett on the way to the hospital, said he was not sure whether Trey was breathing, and asked her to meet him at the hospital. He testified that he would have been unable to reach Dugger, because she was not allowed to carry her cell phone while she was on duty at the prison.

Brown, Wilson, and Trey arrived at the hospital between 3:00 and 3:10 p.m., and Bennett arrived a few minutes later. According to the hospital's records, Trey was assessed at 3:10 p.m., and at that time he was not breathing, his heart was not beating, and he was cool to the touch, with a temperature of 94 degrees. With medications and continued CPR, the medical team was able to revive Trey briefly around 4:25 p.m., with a very low heartbeat that was sustained with artificial respiration for a short period. After further unsuccessful efforts to revive the child, he was pronounced dead at 5:10 p.m.

The medical examiner, a forensic pathologist, performed an autopsy. He found extensive internal bleeding from very severe

lacerations to Trey's liver as a result of an extreme degree of blunt force trauma to the abdomen. The medical examiner testified that the liver injury was of the severity one might see in a motor vehicle accident or a fall from a four-story building. He testified that the severity of the liver injury was not consistent with an accidental cause, such as falling off a bed or being dropped into a bathtub. In the medical examiner's professional opinion, the survival time from infliction of such a liver injury to death would range from several minutes to 30 minutes, with 45 minutes being "a best case scenario" but "very unlikely."

The medical examiner found a large bruise on the victim's abdomen, which overlay the internal injuries, and opined that the same blunt force likely caused both the abdominal bruising and the liver injury. He testified that, because CPR is performed when the patient's heart is not beating, and because bruises typically do not form when the heart is not circulating blood effectively, CPR typically does not cause any bruising. In addition, the medical examiner testified that the abdominal bruise was not in the area

where the medical staff would have done chest compressions for CPR. A nurse who assisted in the resuscitation efforts also testified that the marks on the child's abdomen were not in a location consistent with the location of the chest compressions the medical team performed, stating that the marks were much lower and to the left.

During the autopsy, the medical examiner also found some recent head injuries, specifically, a quarter-sized bruise on Trey's forehead and a mild to moderate amount of subarachnoid hemorrhage, which indicated recent head trauma. In addition, he found eight non-recent rib fractures in various stages of healing. The medical examiner determined that the cause of death was traumatic injuries of the head and abdomen. In his opinion, the liver injury alone was enough to cause Trey's death, and the head injuries possibly shortened the time from the liver injury to death.

OCGA § 24-14-6 provides: "To warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable

hypothesis save that of the guilt of the accused."

> The reasonableness of an alternative hypothesis raised by a defendant is a question principally for the jury, and when the jury is authorized to find that the evidence, though circumstantial, is sufficient to exclude every reasonable hypothesis save that of the accused's guilt, this Court will not disturb that finding unless it is insupportable as a matter of law.

*Cochran v. State*, 305 Ga. 827, 829 (1) (828 SE2d 338) (2019) (citation and punctuation omitted). Wilson contends that the evidence presented at trial was not sufficient to exclude the hypothesis that Dugger injured Trey, either intentionally or accidentally, before she left for work. Wilson testified in his own defense, and his version of events differed from Dugger's in certain respects. While Dugger testified that she did not take Trey out of the living room to clean him and that she left for work at about 1:00 p.m., Wilson testified that Dugger took Trey to the bathroom to clean him and that she left for work "a little bit after 1:30 [p.m.]." He notes that the medical examiner could not say "with certainty" that Trey would have expired by bleeding to death within 45 minutes after receiving the injury but could only say that it was "very unlikely"

that Trey would have lived as long as 45 minutes. In addition, Wilson points to Dugger's testimony that Trey was sickly from birth and that she was overwhelmed in the early months when she was his primary caregiver. Wilson also posits that the rib fractures that were in various stages of healing when Trey died would have been sustained during the period when Dugger was the primary caregiver, suggesting that she had previously abused him.

Viewed in the light most favorable to the verdicts, however, we conclude that the evidence was sufficient to authorize a rational jury to reject Wilson's hypothetical version of events and to find him guilty beyond a reasonable doubt of felony murder predicated on cruelty to children in the first degree. See OCGA § 16-5-70 (b) ("Any person commits the offense of cruelty to children in the first degree when such person maliciously causes a child under the age of 18 cruel or excessive physical or mental pain."). The evidence established that the only possible perpetrators of the fatal abdominal trauma were Wilson or Dugger. Contrary to Wilson's argument, the evidence was not consistent with the victim being

injured by being handled roughly or being dropped into the bathtub. The expert opinion evidence established that death would have occurred within 45 minutes after the abdominal trauma and likely sooner than that. Dugger's last opportunity to injure the victim was before 1:30 p.m., even according to Wilson's timeline, which would have resulted in death by 2:15 p.m. at the very latest. According to Clark's testimony, he saw the victim alive at about 2:45 p.m. And according to Wilson, the victim was alive at the beginning of the short drive to the hospital, close to 3:00 p.m. The evidence authorized the jury to reject as unreasonable Wilson's hypothesis that Dugger injured the victim before she left for work. See *Nixon v. State*, 284 Ga. 800, 802-803 (671 SE2d 503) (2009); *Lindo v. State*, 278 Ga. App. 228, 234-235 (3) (628 SE2d 665) (2006). The evidence was sufficient as a matter of constitutional due process. See *Jackson v. Virginia*, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). Accordingly, we affirm Wilson's felony murder conviction.

*Judgment affirmed. Melton, C. J., Nahmias, P. J., and Blackwell, Boggs, Peterson, Warren, and Bethel, JJ., concur.*

DECIDED MARCH 13, 2020.
Murder. Telfair Superior Court. Before Judge Johnson.
*Steven M. Harrison*, for appellant.
*Timothy G. Vaughn, District Attorney, Keely K. Pitts, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Michael A. Oldham, Assistant Attorney General*, for appellee.